## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | | |
|---|---|---|
| KIMBERLY HARTMAN | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| CENTRA HEALTH, INC., | ) | |
| | ) | **Case No.: 6:20CV00027** |
| STEPHANIE EAST, | ) | |
| | ) | |
| NATHAN CAMPBELL, and | ) | |
| | ) | |
| WESLEY THOMAS GILLESPIE, | ) | |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANTS CENTRA HEALTH, INC., STEPHANIE EAST AND NATHAN CAMPBELL'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

Plaintiff's Complaint attempts to shoehorn meritless state law claims into federal court on the back of a fatally flawed EMTALA theory. Plaintiff fails to assert any viable EMTALA retaliation claim (Count 1) because she fails to plausibly allege any actual underlying EMTALA violation. No patients that presented at Centra's Emergency Department were improperly denied treatment, and EMTALA does not protect any action taken by Plaintiff. Plaintiff's defamation claims (Counts 2 and 3) and business conspiracy claims (Counts 4 and 5) are likewise factually and legally defective. The alleged defamatory statements are unspecified, are true, are non-actionable opinions, and do not give rise to any damages. Plaintiff fails to assert a business conspiracy claim because she fails to identify any injury to a business interest. Finally, Plaintiff's state law wrongful termination claim (Count 6) fails because there is no EMTALA violation and any alleged EMTALA violation, which is grounded in federal law, cannot support a state law wrongful termination claim. For the reasons set forth below, Plaintiff's claims against Defendants

Centra Health Inc. ("Centra"), Stephanie East ("East") and Nathan Campbell ("Campbell") (Counts 1-6) should be dismissed with prejudice.

## PROCEDURAL HISTORY

Since her termination from Centra, Plaintiff has lodged multiple lawsuits and other complaints against Centra and her former colleagues.  In addition to the above-captioned case, Plaintiff currently has at least one other pending lawsuit against Centra, *Hartman v Centra*, Case No. GV20001484, in Lynchburg General District Court.  Like the present case, the lawsuit in General District Court relates to Plaintiff's termination from Centra and alleges that Centra has wrongfully retained possession of her personal chattels.   Plaintiff also unsuccessfully pursued a defamation suit against East related to the same alleged defamatory statements at issue in this case. That suit styled *Hartman v East*, Civil No. GV903738, was nonsuited after Centra filed demurrers identifying the factual and legal defects in Plaintiff's claims.

Plaintiff specifically authorized Stephanie East to speak with the Virginia Healthcare Foundation regarding her employment status at Centra.  Attached as **Exhibit A** is a document signed by Plaintiff and submitted to the Virginia Health Care Foundation that authorized East to provide information to the Virginia Health Care Foundation regarding Plaintiff's employment status at Centra.  Plaintiff also made various reports to the Lynchburg Police Department ("LPD") and local politicians regarding various complaints about her termination and false accusations that Centra has engaged in wrongful activities.  None of the civil litigation or criminal complaints Plaintiff has made have resulted in civil or criminal liability for Centra or any of its employees.

## FACTUAL HISTORY[1]

Plaintiff served as the unit manager for Centra's Child and Adolescent Psychiatric Unit ("CAPU") at Centra facility from July of 2014 until June of 2019.  The facility is an inpatient psychiatric facility at Virginia Baptist Hospital ("VBH") in Lynchburg.  *See* ECF No. 1—1, at 1; *see also* https://www.centrahealth.com/facilities/child-adolescent-psychiatric-unit.  At the time of her termination on June 6, 2019, Plaintiff's supervisors were Dr. Michael Judd and Stephanie East.  Plaintiff alleges that she reviewed the patient census for the CAPU on June 1, 2019, and discovered that emergency room physicians at two other hospitals elsewhere in Virginia had sought to transfer young patients for admission to the CAPU, but the transfers had been denied because the individuals were autistic and lived outside of the Lynchburg area.  Compl. at ¶¶ 30-31, 33.

At the time of her termination from Centra, Plaintiff had an application pending with the Virginia Health Care Foundation seeking scholarship funds for further education required to become a nurse practitioner.  *See id.* at ¶ 16.  As part of her application, Plaintiff permitted the Virginia Health Care Foundation to speak with East regarding Plaintiff's employment status at Centra.  *See* **Exhibit A**.  East, pursuant to the release signed by Plaintiff, spoke with Virginia Health Care Foundation representative Denise Konrad following Plaintiff's termination to advise that Plaintiff was no longer a Centra employee as she had been terminated.

Despite her apparent dissatisfaction and disagreement with the reasons underlying Plaintiff's termination, the Complaint readily acknowledges that Plaintiff was terminated—indeed her termination for cause is referenced in her Complaint.  *See e.g.,* Compl. ¶¶ 4, 22, 59, ECF 1—4.  Nonetheless, in her Complaint, Plaintiff asserts that she told Denise Konrad that she left Centra "for personal reasons."  Compl. ¶ 79.  This false assertion by Plaintiff was confirmed by an e-mail

---

[1] Centra, Campbell, and East disagree with many of the factual assertions made in Plaintiff's complaint.  For purposes of this motion only, Centra relies on the facts arising from the Complaint and documents referenced therein.

produced by the Virginia Health Care Foundation in the prior defamation action filed by Plaintiff against Stephanie East, a copy of which is attached as **Exhibit B**.  The e-mail confirms that Plaintiff told Denise Konrad that she "resigned because her position required more hours than she could work while pursuing her PMHNP."

Based on Plaintiff's Complaint at ¶ 79 and **Exhibit B**, Plaintiff's position is that on the one hand, she left Centra "for personal reasons"[2], and, on the other hand, that she was terminated from Centra, giving rise to multiple (but fatally flawed) claims for retaliation and wrongful termination. *Compare* Compl. at ¶ 79 and **Exhibit B** *with* Compl. ¶¶ 4, 22, 59, and ECF 1—4.  Plaintiff's contradictory factual positions are not just implausible, but logically impossible.  Finally, the other alleged comments by East - which are not specified - were only made to other Centra employees and not published to any third-party.  *See* Compl. ¶ 149.

The letter sent by Campbell is attached to Plaintiff's Complaint as Exhibit G, ECF No. 1—7.  The letter, shown below, speaks for itself in both the facts and opinions provided and its purpose.

**RE: Ban from Centra Health Premises**

Ms. Kim Hartman

On numerous occasions in recent months you have demonstrated aggressive and threatening behavior towards various staff members which has impeded patient care.  You also recorded interactions with staff while on Centra property, which as you know is a direct violation of Centra policy.  This behavior is not acceptable and will not be tolerated.

This letter serves as notification that you are no longer welcome on any Centra Health property unless you or an immediate member of your family requires emergency medical treatment at a designated Emergency Department. Any other appearance by you at any Centra facility will be considered a trespass; the local Police Department will be notified, and you may be arrested.

If you have any questions, please contact me at

Respectfully,

Nathan Campbell
Director Security

Cc:   Lynchburg Police Department
      Paul Valois

---

[2] If this were true, she has no claims for wrongful termination.

The letter addressed to Plaintiff cc'ed the LPD and Paul Valois. The purpose was to notify Plaintiff that she was not allowed at Centra, absent her or a family member requiring emergency medical treatment. To the extent Plaintiff appeared at Centra, the appearance would be deemed a trespass and the LPD would be notified. The LPD's inclusion as a "cc" recipient was plainly so the LPD would be aware the letter had been sent in the event Plaintiff did not comply. This letter was not sent by Centra to any entity with the authority to harm Plaintiff in her professional pursuits. It was sent to the Plaintiff, her attorney, and the LPD whose notice of the letter was important in the event of noncompliance by the Plaintiff. The assertion that Plaintiff recorded interactions with staff was a factual (and true) assertion. The remaining assertion was a statement of opinion that Plaintiff has engaged in aggressive and threatening behavior.

Plaintiff's own allegations and the documents referenced in or attached to her Complaint show that her claims against Centra, East and Campbell are factually and legally defective and should be dismissed with prejudice.

## ARGUMENT AND AUTHORITIES

### 1.    Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." A complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Factual allegations must be enough to raise a right to relief above the speculative level." *Id*. at 555. While the allegations contained in a plaintiff's complaint must be viewed in the light most favorable to the plaintiff, courts need not credit conclusory legal terms and allegations that

are not reasonably supported by factual allegations. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009); *Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475,479 (4th Cir. 2003).

**2.      Plaintiff Fails to Plausibly Allege that she Complained About Any *Actual* EMTALA Violation at VBH as Required to Support Her EMTALA Retaliation Claim (Count 1)**

Congress enacted EMTALA in response to its concern that hospitals were 'dumping' patients unable to pay, by "either refusing to provide emergency medical treatment to patients unable to pay for treatment or transfer[ring] those patients before their emergency medical conditions were stabilized." *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 534 (4th Cir. 2020) (internal citations omitted). The intent of EMTALA, therefore, was "to provide access to emergency care to all individuals ***who present to an emergency department*** and are determined to have an emergency medical condition, including the uninsured." 73 FR 48434-01, 48660, 2008 WL 3833378, (Aug 19, 2008) (emphasis added); *see* 42 U.S.C. §1395dd(a).

EMTALA's "avowed purpose . . . was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate *first* response to a medical crisis' for all patients." *Baber v. Hospital Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992) (quoting 131 Cong.Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger) (emphasis added)). "In keeping with this purpose, EMTALA imposes two main obligations on hospitals with emergency rooms. First, EMTALA requires a hospital to screen an individual to determine whether he has an emergency medical condition . . .  Second, EMTALA requires a hospital to stabilize an individual's emergency medical condition in certain limited circumstances." *Williams*, 952 F.3d at 534 (citing 42 U.S.C. §1395dd(a)-(b)). Once the individual is stabilized, EMTALA obligations end. *See, e.g.*, 59 FR 32086-01, 32105, 1994 WL 272093 (June 22, 1995) (regulations rejecting the suggestion that EMTALA requires medically indicated treatment after stabilization and stating: "[EMTALA] does not impose any requirements on

hospitals with respect to the treatment or transfer of individuals whose emergency condition has been stabilized.").

"Critically, EMTALA defines 'to stabilize' as 'to provide such medical treatment of the [emergency medical condition] as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result *from or occur during the transfer* of the individual from a facility . . .'" *Id.* at 535 (citing 42 U.S.C. § 1395dd(e)(3)) (emphasis in original). EMTALA's stabilization requirement, therefore, is "defined . . . *without any reference to the patient's long-term care within the system.*" *Id.* (quoting *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349, 352 (4th Cir. 1996) (emphasis added)). In this regard, the Fourth Circuit in *Bryan* stated:

> It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient ***only in the immediate aftermath*** *of the act of admitting her for emergency treatment* and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that [long-term] treatment. ***It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context***.

*Id.* (emphasis added). Thus, the Court in *Bryan* found that a hospital's entry of an anti-resuscitation order that led to an individual's death following her heart attack 12 days after she arrived at the emergency room, was not a cognizable violation under EMTALA and was appropriately dismissed on a 12(b)(6) motion because EMTALA does *not* impose an obligation to "continuously… 'stabilize' [a individual's] condition" beyond providing "immediate, emergency stabilizing treatment with appropriate follow-up." *Id.* at 350-51.

The reason EMTALA is limited in scope to "immediate, emergency stabilizing treatment," and excludes continuous care, is simple:

> Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed *not by EMTALA*

but by the state malpractice law that everyone agrees EMTALA was not intended
to preempt.

*Id.* at 351 (emphasis added).

As discussed below, the young individuals at issue were not entitled, under EMTALA, to
admission and continuing care in VBH's inpatient, psychiatric unit.  Thus, Plaintiff's allegations
challenging their denial on the grounds of "autism, out of area" are not directed to reporting any
actual EMTALA violation and cannot plausibly support any EMTALA whistleblower retaliation
claim.  Accordingly, Count I should be dismissed, with prejudice, for the reasons discussed below.

### (a)    *Reporting of an Actual EMTALA Violation is Required to State an EMTALA Whistleblower Retaliation Claim*

Section 42 U.S.C. § 1395dd(i) of EMTALA is entitled "Whistleblower protections" and
provides:

> A participating hospital may not penalize or take adverse action [1] against a
> qualified medical person ... or a physician because the person or physician refuses
> to authorize the transfer of an individual with an emergency medical condition that
> has not been stabilized or [2] against any hospital employee because the employee
> reports *a **violation*** of a requirement of this section.

*Id.* § 1395dd(i) (emphasis added).  Plaintiff attempts to invoke the second clause of § 1395dd(i) to
assert a retaliation claim against Centra under Count I.  In order to assert such a claim, Plaintiff
must plausibly allege an *actual* violation of EMTALA, and as discussed herein, she has failed to
do so.

Prior to joining the Supreme Court, Judge Gorsuch, writing for the Tenth Circuit,
recognized that "[t]he second clause of the whistleblower protection provision permits suit only
by those reporting '*a violation* of a requirement of EMTALA' [and] [n]either [clause]
contemplates a cause of action for an EMTALA violation that is yet to be."  *Genova v. Banner
Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) (emphasis in original).  Judge Gorsuch went on to

hold, the statute's language requiring a report of an actual violation under the second clause "is plain and not absurd on its face." *Id.* (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005)).

In reaching this conclusion, Judge Gorsuch recognized that the first clause addresses *one* specific kind of potential, prospective violation because it protects those who refuse to authorize a premature or improper transfer, but the second clause, in contrast, protects *only* reporting of an actual violation. *Id.* at 1098-99. "The fact Congress mentioned and protected those who report *one* sort of prospective violation suggests it was well aware that those who report potential … EMTALA violations might suffer retaliation[and] [i]t shows Congress knew well how to protect such persons if it wished to do so[and it did not]." *Id.* at 1099-1100 (emphasis in original). Judge Gorsuch further found that "it's clear that Congress's purpose in EMTALA was to fire a rifle at discrete and carefully chosen targets, not to loose a federal blunderbuss in the general direction of 'patient protection." *Id.* at 1100-01.

As discussed below, while Plaintiff may have been complaining about what she viewed as appropriate actions that should have been taken in the name of generalized "patient protection" concerns, her complaint about the alleged "autism, out of area" exclusion is not and was not a complaint about an actual violation of EMTALA, and therefore fails to plausibly support any claim for retaliation under EMTALA.

### (b)     EMTALA Is Triggered Only When An Individual "Comes To The Emergency Department" of the Hospital

As the statute and numerous courts, including the Fourth Circuit, have recognized EMTALA is not and cannot be triggered unless and until an "individual ... *comes to the emergency department* ..." of the hospital that is charged with violating EMTALA. *Baber*, 977 F.2d at 884 (quoting 42 U.S.C. § 1395dd(a)). In *Baber*, for example, the Fourth Circuit held that an individual in psychiatric distress who was transferred from the emergency department of one hospital, to an

inpatient psychiatric ward of the receiving hospital, could not support a claim for a violation of EMTALA against the receiving hospital because EMTALA's obligations cannot and do not, as a matter of law, apply to the psychiatric ward of the transferee hospital.  *Id.*  Because it was "undisputed that Ms. Baber did not present herself to [the] emergency department for treatment[,] [and, instead was] admitted … to the psychiatric ward of [the transferee hospital] … [there were] no facts [that could] support Mr. Baber's claim against [the transferee hospital for a violation of EMTALA]."  *Id.*

Similarly, in *Miller v. Med. Ctr. of Sw. Louisiana*, 22 F.3d 626, 627 (5th Cir. 1994), the court found that a nine-year-old child, whose leg was seriously injured in an automobile accident and was treated in the emergency room of a nearby hospital, could not state an EMTALA claim against another hospital that refused to accept his transfer for emergency surgical debridement on the grounds that "he had no insurance."  In affirming the district court's 12(b)(6) dismissal, the Fifth Circuit held:

> Under the terms of the statute … [EMTALA] duties are only triggered when an individual "*comes to* the emergency department *and a request is made* on the individual's behalf for examination or treatment...." 42 U.S.C. § 1395dd (emphasis added). These two preconditions are conjunctive requiring both that an individual 1) comes to the emergency department and 2) that a request be made. In the instant case, it is the first requirement that is problematic.

*Miller*, 22 F.3d at 628 (emphasis in original).  The Court recognized that "[i]t is undisputed that Nick Miller never physically came to the emergency department at Hamilton. There was only a request over a telephone [during which Hamilton denied the transfer for lack of insurance]."  *Id.* The Court stated:  "[W]e hold Congress to its words when it said that an individual must 'come to' the emergency department to trigger a hospital's duty under EMTALA."  *Id.* at 629.  Because Miller "never 'came to' the emergency department at Hamilton as required by EMTALA," the Fifth Circuit held that "Plaintiffs have failed to state a claim on which relief could be granted and

the district court correctly granted Hamilton's motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Id.* at 630.

In her Complaint, Plaintiff alleges that the VBH's CAPU is an inpatient, psychiatric unit. Compl. at ¶ 24, Ex. A.  She alleges that she reviewed the patient census for the CAPU on June 1, 2019, and discovered that emergency room physicians at two other hospitals elsewhere in Virginia had sought to transfer young patients for admission to the CAPU, but the transfers had been denied because the individuals were autistic and lived outside of the Lynchburg area. *Id.* at ¶¶ 30-31, 33.

Plaintiff, however, does not and cannot allege that these young patients "came to" VBH's emergency department.  Indeed, her purported "EMTALA violation" is VBH's refusal to admit the individuals to VBH's *inpatient, psychiatric ward*.  As in *Baber* and *Miller*, the allegations are wholly insufficient to support a claim of an actual violation of EMTALA, and cannot support her EMTALA whistleblower retaliation claim.

### (c) *EMTALA Does Not Require Inpatient Admission to VBH's CAPU & VBH's CAPU Is Not the Type of Specialized Facility Subject to § 1395dd(g)'s Transfer Requirement*

In an effort to shoehorn her general concern with VBH's alleged "autism, out of area" exclusion from CAPU's inpatient facility into an EMTALA claim, Plaintiff vaguely references EMTALA's nondiscrimination provision relating to specialized capabilities or facilities.  *See* Compl. at ¶ 129 (quoting § 1395dd(g)).  The CAPU, however, is not an emergency department; it is an inpatient psychiatric ward (as in *Baber*) that is not the type of specialized, emergency care facility subject to the transfer requirements of § 1395dd(g).

In fact, EMTALA does not require inpatient admissions, and admission of an individual as an inpatient ends any and all obligations under EMTALA.  *See, e.g., Baber*, 977 F.2d at 884 (finding transfer and admission of an individual to a hospital's inpatient psychiatric ward is

insufficient to trigger EMTALA for the transferee hospital); *Hussain v. Kaiser Found. Health Plan,* 914 F.Supp. 1331, 1335 (E.D.Va.1996) ("If EMTALA liability extended to inpatient care, EMTALA would be convert[ed]...into a federal medical malpractice statute, something it was never intended to be"); 73 FR 48434-01, 48661, 2008 WL 3833378 (Aug. 19, 2008) (CMS regulations "finalizing a policy that a hospital with specialized capabilities is not required under EMTALA to accept the transfer of a hospital inpatient"); 42 C.F.R. § 489.24(a)(1)(ii) ("If the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under [EMTALA] ends"); 42 C.F.R. § 489.24(d)(2) (*generally excluding inpatients from the stabilization requirement*s of EMTALA, and recognizing that care of inpatients is governed by Medicare conditions of participation set forth under the Standards and Certifications requirements of Part 482, not EMTALA). The fact that the CAPU is an inpatient facility in and of itself demonstrates that Plaintiff cannot rely on EMTALA or §1395dd(g) to state any EMTALA claim.

In addition, the types of facilities included in § 1395dd(g) further demonstrate that the CAPU is not the type of specialized facility subject to § 1395dd(g)'s transfer requirements. Section 1395dd(g) is titled "Nondiscrimination," and provides:

> A participating hospital that has specialized capabilities or facilities (*such as burn units, shock-trauma units, neonatal intensive care units*, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual *who requires* such specialized capabilities or facilities if the hospital has the capacity to treat the individual. (emphasis added)

Burn units, shock-trauma units and neonatal intensive care units are exactly the type of highly specialized units that are necessary to provide "*immediate*, emergency stabilizing treatment." *Bryan*, 95 F.3d at 351. The CAPU, by contrast, is not a highly specialized emergency department required for *immediate, emergency* stabilizing treatment; it is an inpatient facility to which EMTALA does not apply. *See Baber*, 977 F.2d at 884; 42 C.F.R. § 489.24(d)(2) (generally

excluding inpatients from the stabilization requirements of EMTALA); *Bryan*, 95 F.3d at 352 ("EMTALA's stabilization requirement is focused upon the patient's emergency medical condition, not the patient's general medical condition").

In essence, Plaintiff is attempting to expand the limited scope of EMTALA to require transfers, not just to the highly-specialized *emergency* units that are, in fact, *required* for immediate, emergency stabilization (like burn units, shock-trauma units and neonatal intensive care units), but to expand EMTALA's transfer obligations to any and all hospital units that may be preferred for longer-term, inpatient care—units to which EMTALA does not apply. *See Baber*, 977 F.2d at 884 (finding an inpatient psychiatric ward to be outside the scope of EMTALA).

Try as she might, Plaintiff simply cannot convert EMTALA's rifle-shot at "discrete and carefully chosen targets [into a]…federal blunderbuss in the general direction of 'patient protection," to protect her generalized grievance with the alleged "autism, out of area" exclusion for inpatient admission to VBH's CAPU. *See Genova*, 734 F.3d at 1100-01. Because Plaintiff fails to plausibly allege that she was retaliated against for complaining about an actual violation of EMTALA, she cannot, as a matter of law assert any EMTALA whistleblower retaliation claim against Centra. Count I, therefore, should be dismissed with prejudice.

## 3. Plaintiff's Defamation Claim against Centra and East (Count 2) is Likewise Implausible and Not Actionable

In her second cause of action, Plaintiff alleges defamation by Centra and East, based on two separate statements: (1) a report by East to the Virginia Health Care Foundation, and (2) a report by East to other Centra employees. Neither of these statements are actionable, and this count should be dismissed under Rule 12(b)(6) because the allegations do not set out the alleged defamation in *haec verba*, the statements are either true or matters of opinion, and at least one of the statements is subject to a qualified privilege that exists in the context of employment

relationships, and intra-corporate statements do not constitute publication as required to assert a defamation claim.

### *(a)   East's Report to the Virginia Health Care Foundation*

Plaintiff alleges that East made a "false report to the Virginia Health Care Foundation that Plaintiff had been fired 'for cause'," and that this statement is defamatory *per se* because it prejudices Plaintiff in her profession.  Compl. ¶ 146.  Furthermore, Plaintiff claims that this statement was "not an expression of opinion, but a deliberate lie" because "East knew that Ms. Hartman's employment was terminated unlawfully and without cause because M[s]. Hartman reported EMTALA violations."  Compl. ¶ 147.  Plaintiff's assertions are factually and legally misguided.

As a preliminary matter, the existence of this Complaint is based on the assertion that she was terminated for cause.  Compl. ¶¶ 4, 22, 59, and ECF 1—4.  While Plaintiff may disagree with the rationale on which Centra relied in terminating her, the Complaint confirms that the statements made by East to Denise Konrad are true.  *Id.*  That is, even if she disagrees with the rationale, it remains a fact that she was terminated for cause.  Although Plaintiff may not wish to acknowledge the facts and scenario surrounding her termination from Centra, she was indeed terminated "for cause."   The complaint itself and the exhibits thereto confirm this.  *Id*.   Further, Plaintiff specifically permitted East to speak with the Virginia Health Care Foundation regarding Plaintiff's employment status at Centra.  *See* **Exhibit A**.  East's correspondence with Denise Konrad were at the direction of Plaintiff and were true based on Plaintiff's own allegations.  The face of the Complaint, therefore, reveals that Count Two is implausible to the extent it relies on East's statements to Plaintiff.

Count Two is further deficient in that Plaintiff fails to plead the "exact words" alleged to be defamatory, a longstanding and absolute requirement in Virginia. Failure to plead the alleged defamation in *haec verba* is a fatal deficiency. *See Owens v. DRS Auto. Fantomworks, Inc.*, 87 Va. Cir. 30, 32 (Norfolk 2013) ("The Defendants' pleadings fail to reach the heightened pleading requirement for defamation because there is a glaring lack of exact words or phrases used by the Plaintiffs…the exact words spoken or written must be set out in the declaration in *haec verba*…words of equivalent or similar import are not sufficient.") (quoting *Morris v. Massingill*, 59 Va. Cir. 426, 428 (Norfolk 2002)).

### *(b)* *Report to Centra Employees*

In Count Two, Plaintiff alleges that "East also defamed Ms. Hartman by falsely reporting to Centra employees after Ms. Hartman's employment had been terminated, that Ms. Hartman was 'mentally ill', and that Ms. Hartman posed a risk of gun violence to these employees." Compl. ¶ 149. Again, this allegation does not meet the requirements to plausibly state a claim for defamation.

Virginia recognizes a qualified privileged in the context of employment relationships. This privilege applies to statements "made between co-employees and employers in the course of employee disciplinary or discharge matters" and it can only be overcome by a showing of malice. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000) (recognizing "employment matters are occasions of privilege in which the absence of malice is presumed."). "A communication, made in good faith on a subject in which the communicating party has an interest or owes a duty, is qualifiedly privileged if the communication is made to a party who has a corresponding interest or duty." *Jones v. Pembrooke Occupational Health, Inc.*, 26 Va. Cir. 206, 207 (Richmond City 1992) (quoting *Smalls v. Wright*, 241 Va. 52, 54 (1991)).

Aside from the conclusory statement that East acted with malice, there are no facts alleged that show malice on the part of East. Such conclusory allegations do not give rise to a pleading sufficient to overcome the qualified privilege. *Tomlin v. IBM Corp.*, 84 Va. Cir. 280, 288 (Fairfax Co. 2012) (citing *Jarrett v. Goldman*, 67 Va. Cir. 361 (Portsmouth 2005)).

Additionally, because Centra employees are not considered third parties, the alleged statements cannot be defamatory because they were not published to third parties, as required to state a defamation claim. *Shaheen v. WellPoint Companies, Inc.*, 490 Fed. App'x 552, 555 n. 2 (4th Cir. 2012) ("publication element of a defamation action requires dissemination of the statement to a third party in a nonprivileged context"); *Cobb v. Rector & Visitors of Univ. of Va.*, 84 F.Supp.2d 740, 750 (W.D.Va. 2000) ("No publication occurs when the communication, which regards a matter of corporate interest, remains entirely within a corporate entity.") So long as the subject matter of the statement relates to the job function or scope or duties to the employees who hear the statement, there is no publication. *Montgomery Ward & Co. v. Nance*, 165 Va. 363, 380 (1935). Here the allegation is that challenged statements were made relating to matters of safety at Centra. Though the identity of the persons who heard the statement is not alleged, the Complaint gives no indication that a discussion of safety or dangers at work would fall outside the scope of employment for whomever heard the statements at issue.

### 4.     Plaintiff's Defamation Claim against Centra and Campbell (Count 3) Fails Because Campbell's Statements Were An Opinion for A Permissible Purpose

For her third cause of action, Plaintiff alleges that Campbell defamed her by sending a letter to the Lynchburg Police Department reporting that Plaintiff "had exhibited 'aggressive and threatening behavior towards various staff members.'" Compl. ¶¶ 154-56. Yet again, Plaintiff's pleadings under this count are fatally flawed and should be dismissed under Rule 12(b)(6).

Virginia recognizes a qualified privilege in the context of employment relationships.  This privilege applies to statements "made between co-employees and employers in the course of employee disciplinary or discharge matters" and it can only be overcome by a showing of malice. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000) (recognizing "employment matters are occasions of privilege in which the absence of malice is presumed.").

In order to be "actionable," a statement must be both "false and defamatory."  *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015).  Because statements of opinion cannot be "false," they are never actionable.  *See Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 (2003) ("Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion.") (internal citation omitted).  Plaintiff may assert that the alleged defamatory statement contains a "factual kernel…which can be objectively proven to be true or false."  *Lamb v. Weiss*, 62 Va. Cir. 259 (2003).  But where a statement with even some apparent basis in fact turns on a subjective judgment, it still qualifies as an opinion. *See Raytheon Tech. Servs. Co. v. Hyland*, 273 Va. 292, 305 (2007) (holding that it is a statement of opinion – not a statement of fact – to criticize an employee for being "frequently verbose and vocal in her opinions," since "the negative conduct, and whether and how often it occurred, is a matter of the speaker's perspective").

Finally, contrary to Plaintiff's baseless assertions that these statements are *per se* defamatory, it is indisputable that the alleged defamatory statements do not prejudice Plaintiff in her profession and are therefore not defamatory *per se*.  These statements were not made to any potential employer, but instead were made to the LPD in order to communicate information necessary to ensure that the LPD was prepared in the event Plaintiff did not comply with Centra's instructions that Plaintiff remain off Centra's property.  Outside of instances of *per se* defamation, damages are not presumed.  *See Fleming v. Moore*, 221 Va. 884, fn. 4 (1981) ("The presumption

of damages is the critical distinction between defamation *per se* and other actions for defamation."). Therefore, even if the statements were defamatory, which they are not, Plaintiff's third cause of action must be dismissed because Plaintiff has not identified any damages connected to the statements. *See WJLA-TV v. Levin*, 264 Va. 140, 164 (2002) ("in the absence of evidence that he personally suffered actual damages as a result of the defamation, the plaintiff was entitled to recover nothing.").

### 5.   Plaintiff's Business Conspiracy Claim (Count 4) Fails Because Plaintiff Fails to Identify any Injury to a Business Interest or Plausibly Allege Unlawful Conduct.

In Count Four, Plaintiff attempts to assert a statutory business conspiracy claim against Centra and East pursuant to Virginia Code § 18.2-499(B). This claim should be dismissed pursuant to Rule 12(b)(6) because Plaintiff fails to plausibly allege any such conspiracy claim.

Plaintiff's statutory business conspiracy claim must be dismissed pursuant to Rule 12(b)(6) because "it is well-settled that § 18.2-499 applies only to injuries 'to business and property interests, not to personal or employment interests.'" *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, *11 (W.D. Va. 2015) (internal brackets removed) (quoting *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012)); *Andrews v. Ring*, 266 Va. 311, 319 (2003) ("We conclude that the origin of Code §§ 18.2-499 and -500 establishes that they apply to business and property interests, not to personal or employment interests."). The harm alleged in Plaintiff's complaint concerns personal and employment interests only. Plaintiff confirms as much where she alleges that Centra and East's goal was to "deny Ms. Hartman the scholarship she needed to further her education and professional development." Compl. ¶ 163. Even if this were true, which is not the case, there is no business or property interest at issue, only non-actionable personal interests. Therefore, Plaintiff's claim for statutory business conspiracy must be dismissed.

Additionally, Plaintiff's statutory conspiracy claim should be dismissed because she fails to plausibly allege an actionable underlying tort, or unlawful act, as required to state a conspiracy claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007).  "[A]ctions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap v. Cottman Transmission Systems, LLC*, 287 Va. 207, 215,  754 S.E.2d 313, 317 (2014) (citing *Beck v. Prupis*, 529 U.S. 494, 501 (2000)).  Plaintiff fails to allege any unlawful act underlying the alleged conspiracy, and therefore her allegations of statutory conspiracy in violation of Virginia Code § 18.2-499(B) must fail.

### 6.    Plaintiff fails to Allege Statutory Business Conspiracy (Count 5) by Centra, Campbell and Gillespie in Violation of Virginia Code § 18.2-499(B)

Plaintiff alleges in her fifth count that Gillespie, Campbell and Centra violated Virginia Code § 18.2-499(B) via harassment and intimidation, including the attempted enlisting of a uniformed Lynchburg police officer "to harass and intimidate Ms. Hartman and her family." Compl. ¶¶167-70.

As with Count 4, Count 5 must likewise be dismissed because she alleges nothing more than purported harm to personal interests that are not protected by Virginia Code § 18.2-499, which applies only to injuries 'to business and property interests, not to personal or employment interests.'" *Hanger*, 2015 WL 3439255, *11 (internal brackets removed) (quoting *Shirvinski*, 673 F.3d at 321); *Andrews*, 266 Va. at 319.

Additionally, and as with Count 4, Plaintiff's statutory conspiracy claim under Count 5 likewise fails because she fails to plausibly allege an actionable underlying tort, or unlawful act, as required to state a conspiracy claim. *Bell Atl. Corp.*, 550 U.S. at 556-57; *Dunlap*, 287 Va. at 215; *Beck*, 529 U.S. at 501.  Because Plaintiff again fails to allege any unlawful act underlying the alleged conspiracy, Count 5 must be dismissed.

### 7.      Counts 4 and 5 are Barred by the Doctrine of Intracorporate Immunity.

Gillespie, Campbell, and East were all Centra employees at the time the alleged conspiracies in Counts 4 and 5 took place.  Compl. at ¶¶ 11-13.  It is "a legal impossibility" for a corporation to conspire with employees acting within the scope of their employment.  *Selman v. American Sports Underwriters, Inc*., 697 F. Supp. 225, 238 (W.D. Va. 1988).  "A corporation cannot conspire with its employees or agents because 'the officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc*., 258 F. Supp. 2d 461, 464-65 (W.D. Va. 2003).  It is black letter law in Virginia and in the Fourth Circuit that an entity cannot conspire with its own employees acting within the scope of their employment.  *Vollette v. Watson*, 937 F. Supp. 2d 706, 727 (E.D. Va. 2013).

Counts 4 and 5 each allege that Centra conspired with its own employees to harm Plaintiff.  Virginia Courts have repeatedly held that such claims are barred by the doctrine of Intracorporate Immunity—Counts 4 and 5 should be dismissed.

### 8.      Plaintiff Fails to State a Claim for Wrongful Termination by Centra in Violation of Public Policy (Count 6)

Finally, Plaintiff's claim for wrongful termination in violation of public policy must be dismissed pursuant to Rule 12(b)(6) because wrongful termination is a "very limited" exception to the at-will employment doctrine that applies in only three instances, none of which are plausibly alleged here.

Plaintiff's claim is based on *Bowman*, 229 Va. at 539-540, 331 S.E.2d 797, which recognized a state law claim for wrongful termination under certain, limited circumstances.  "[A] claim under *Bowman* 'must find root in a state statute[]'; it cannot have its genesis in an act of

Congress." *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 450-51 (E.D. Va. 2002) (quoting *McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998)); *see also Oakley v. The May Department Stores, Co.*, 17 F. Supp. 2d 533, 536 (E.D. Va. 1998) (explaining that "Title VII [of Civil Rights Act of 1964] cannot be used to support a *Bowman* claim, because the *Bowman* exception … is predicated on public policies derived from Virginia statutes, not federal laws.") (citations omitted). Because Plaintiff premises her wrongful termination claim on EMTALA, a federal statute, and not a Virginia statute, this claim fails as a matter of law.

Second, even if EMTALA could serve as the basis for a state law wrongful termination claim (and it cannot, as a matter of law). Plaintiff's claim would fail for the same reasons her EMTALA whistleblower retaliation claim (Count 1) fails.

Third, wrongful termination claims can only arise in three, limited instances: "(1) where 'an employer violated a policy enabling the exercise of an employee's [Virginia] statutorily created right[]'; (2) where 'the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy[]'; and (3) where 'the discharge was based on the employee's refusal to engage in a criminal act.'" *Storey*, 207 F. Supp. 2d at 451 (quoting *Rowan*, 263 Va. 209). In this instance, Centra did not violate any policy enabling the exercise of any of Plaintiff's statutorily created rights. Furthermore, if basing her claim for wrongful termination on the EMTALA statute (which is cannot support a claim for the reasons discussed above), Plaintiff nonetheless was not an individual seeking medical care and therefore was not a member of the class of persons intended to be protected by EMTALA. Finally, it is clear that Centra's termination of Plaintiff's employment was in no way connected to any refusal by Plaintiff to engage in a

criminal act.  Therefore, Plaintiff's claim for wrongful termination cannot fall within any of the three situations wherein such claims are permitted.

Plaintiff, therefore, fails to plausibly plead any claim for wrongful termination under Count 6, and Count 6 must be dismissed.

**CONCLUSION**

For the foregoing reasons, Centra, Campbell and East respectfully request that this Court dismiss Plaintiff's Complaint with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6) and award them such other relief as this Court may deem just and proper.

Dated:  July 14, 2020                     Respectfully submitted,

      /s/ J. Walton Milam III
Joshua F. P. Long (VSB No. 30285)
Joshua R. Treece (VSB No. 79149)
J. Walton Milam, III (VSB No. 89406)
Woods Rogers PLC
P.O. Box 14125
10 South Jefferson Street, Suite 1400
Roanoke, Virginia 24038-4125
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
jlong@woodsrogers.com
jtreece@woodsrogers.com
wmilam@woodsrogers.com

*Defendants Centra Health, Inc., Stephanie East, and Nathan Campbell*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 14th day of July, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to the following counsel of record:

M. Paul Valois, Esq.
JAMES RIVER LEGAL ASSOCIATES
7601 Timberlake Road
Lynchburg, VA 24502
Phone: 434-845-4529
Fax:     434-845-8536
mvalois@vbclegal.com

*Counsel for Plaintiff Kimberly Hartman*

Eric P. Burns, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102
(703) 245-9300
(703) 245-9301 (Fax)
eric.burns@wilsonelser.com

*Counsel for Defendant Wesley Gillespie*

　　　　　　　　　　　　　　 /s/ J. Walton Milam III　　　　　.