## IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| **KIMBERLY HARTMAN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CENTRA HEALTH, INC.,** | ) |
| | ) **Case No.: 6:20CV00027** |
| **STEPHANIE EAST,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **NATHAN CAMPBELL,** | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS CENTRA HEALTH, INC., STEPHANIE EAST AND NATHAN CAMPBELL'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants Centra Health Inc. ("Centra"), Stephanie East ("East") and Nathan Campbell ("Campbell"), (collectively, "Defendants"), submit this Memorandum in Support of their Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") (Doc. 17).

Plaintiff's FAC attempts to shoehorn meritless state law claims into federal court on the back of a fatally flawed EMTALA theory. Plaintiff fails to assert any viable EMTALA retaliation claim (Count 1) because she fails to plausibly allege any actual underlying EMTALA violation. No patients that presented at Centra's Emergency Department were improperly denied treatment, and EMTALA does not protect any action taken by Plaintiff. Plaintiff's defamation claims (Counts 2 and 3) are likewise factually and legally defective. The alleged defamatory statements are unspecified, are true, are non-actionable opinions, and do not give rise to any damages. Finally, Plaintiff's state law wrongful termination claim (Count 4) fails because there is no EMTALA violation and any alleged EMTALA violation, which is grounded in federal law, cannot support a state law wrongful termination claim. Plaintiff's FAC should be dismissed with prejudice.

## PROCEDURAL HISTORY

Since her termination from Centra, Plaintiff Kimberly Hartman ("Plaintiff") has lodged multiple lawsuits and other complaints against Centra and her former colleagues.  In addition to the above-captioned case, Plaintiff currently has at least one other pending lawsuit against Centra, *Hartman v Centra*, Case No. GV20001484, in Lynchburg General District Court.  Like the present case, the lawsuit in General District Court relates to Plaintiff's termination from Centra and alleges that Centra has wrongfully retained possession of her personal chattels.  Plaintiff also unsuccessfully pursued a defamation suit against East related to the same alleged defamatory statements at issue in this case.  That suit styled *Hartman v East*, Civil No. GV903738, was nonsuited after Centra filed demurrers identifying the factual and legal defects in Plaintiff's claims.

Plaintiff's assertion in Paragraph 78 of the FAC that "[n]either Centra nor Stephanie East had any legitimate interest in Ms. Hartman's scholarship application on June 10, 2019," is contradicted by a letter signed by Plaintiff on May 31, 2019:



The document signed by Plaintiff was submitted to the Virginia Health Care Foundation to specifically authorize East to provide information to the Virginia Health Care Foundation regarding Plaintiff's employment status at Centra.  *See* **Exhibit A**. Plaintiff also made various

reports to the Lynchburg Police Department ("LPD") and local politicians regarding various complaints about her termination and false accusations that Centra has engaged in wrongful activities.  None of the civil litigation or criminal complaints Plaintiff has made have resulted in civil or criminal liability for Centra or any of its employees.

## PLAINTIFF'S FACTUAL ALLEGATIONS[1]

Plaintiff served as the unit manager for Centra's Child and Adolescent Psychiatric Unit ("CAPU") at Centra facility from July of 2014 until June of 2019.  The facility is an inpatient psychiatric facility at Virginia Baptist Hospital ("VBH") in Lynchburg.  *See* FAC at ¶ 24; *see also* https://www.centrahealth.com/facilities/child-adolescent-psychiatric-unit.   At the time of her termination on June 6, 2019, Plaintiff's supervisors were Dr. Michael Judd and East.  Plaintiff alleges that she reviewed the patient census for the CAPU on June 1, 2019, and discovered that emergency room physicians at two other hospitals elsewhere in Virginia had sought to transfer young patients for admission to the CAPU, but the transfers had been denied because the individuals were autistic and lived outside of the Lynchburg area.  FAC at ¶¶ 30-31, 33.

At the time of her termination from Centra, Plaintiff had an application pending with the Virginia Health Care Foundation seeking scholarship funds for further education required to become a nurse practitioner.  *See id.* at ¶ 15.  As part of her application, Plaintiff permitted the Virginia Health Care Foundation to speak with East regarding Plaintiff's employment status at Centra.  *See* **Exhibit A**.  East, pursuant to the release signed by Plaintiff, spoke with Virginia Health Care Foundation representative Denise Konrad following Plaintiff's termination to advise that Plaintiff was no longer a Centra employee as she had been terminated.

_____

[1] Centra, Campbell, and East dispute Plaintiff's factual allegations in the FAC.  For purposes of this motion only, Centra relies on the facts arising from the FAC and documents referenced therein.  Even under Plaintiff's own factual allegations, the FAC fails to state a claim against Defendants and should be dismissed with prejudice.

Despite Plaintiff's apparent dissatisfaction and disagreement with the reasons underlying the decision, the FAC readily acknowledges that Centra terminated her employment.  *See e.g.,* FAC ¶¶ 21, 60, ECF 17—4.  Nonetheless, in her FAC, Plaintiff acknowledges that she lied and told Denise Konrad ("Konrad") that she left Centra "for personal reasons."  FAC. ¶ 80.  Plaintiff's lie to Konrad is further confirmed by an e-mail produced by the Virginia Health Care Foundation in the prior defamation action filed by Plaintiff against Stephanie East, a copy of which is attached as **Exhibit B**.  The e-mail confirms that Plaintiff lied and told Konrad that she "resigned because her position required more hours than she could work while pursuing her PMHNP."

Based on Plaintiff's FAC at ¶ 80 and **Exhibit B**, Plaintiff's position is that on the one hand, she left Centra "for personal reasons"[2], and, on the other hand, that she was terminated from Centra, giving rise to multiple (but fatally flawed) claims for retaliation and wrongful termination. *Compare* FAC at ¶ 80 and **Exhibit B** *with* FAC ¶¶ 4, 21, 60, and ECF 1—4.  Plaintiff cannot have it both ways.  Plaintiff's contradictory factual positions are not just implausible, they are impossible.  Finally, the other alleged comments by East - which are not specified - were only made to other Centra employees and not published to any third-party.  *See* FAC ¶ 149.

The letter sent by Campbell is attached to Plaintiff's First Amended Complaint as Exhibit G, ECF No. 1—7.  The letter, shown below, speaks for itself in both the facts and opinions provided and its purpose.

---

[2] If this were true, she has no claims for wrongful termination.

RE: Ban from Centra Health Premises

Ms. Kim Hartman

On numerous occasions in recent months you have demonstrated aggressive and threatening behavior towards various staff members which has impeded patient care. You also recorded interactions with staff while on Centra property, which as you know is a direct violation of Centra policy. This behavior is not acceptable and will not be tolerated.

This letter serves as notification that you are no longer welcome on any Centra Health property unless you or an immediate member of your family requires emergency medical treatment at a designated Emergency Department. Any other appearance by you at any Centra facility will be considered a trespass; the local Police Department will be notified, and you will be arrested.

If you have any questions, please contact me at ███████

Respectfully,

Nathan Campbell
Director Security

Cc:    Lynchburg Police Department
       Paul Valois

The letter was addressed to Plaintiff with copies to the LPD and Paul Valois (Plaintiff's attorney). The purpose was to notify Plaintiff that she was not allowed at Centra, absent her or a family member requiring emergency medical treatment. To the extent Plaintiff appeared at Centra for reasons unrelated to emergency medical treatment for her or her immediately family members, her appearance would be deemed a trespass and the LPD would be notified. The LPD's inclusion as a "cc" recipient was plainly so the LPD would be aware the letter had been sent in the event Plaintiff did not comply. This letter was not sent by Centra to any entity with the authority to harm Plaintiff in her professional pursuits. It was sent to the Plaintiff, her attorney, and the LPD whose notice of the letter was important in the event of noncompliance by the Plaintiff. The assertion in the letter that Plaintiff recorded interactions with staff was a factual (and true) assertion. The remaining assertion was a statement of opinion that Plaintiff has engaged in aggressive and threatening behavior.

Plaintiff's own allegations and the documents referenced in or attached to her FAC show that her claims against Centra, East and Campbell are factually and legally defective and should be dismissed with prejudice.

## ARGUMENT AND AUTHORITIES

### 1.     Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted."  A complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"Factual allegations must be enough to raise a right to relief above the speculative level." *Id*.  While the allegations contained in a plaintiff's complaint must be viewed in the light most favorable to the plaintiff, courts need not credit conclusory legal terms and allegations that are not reasonably supported by factual allegations.  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009); *Taubman Realty Group Ltd. P'ship v. Mineta*, 320 F.3d 475,479 (4th Cir. 2003).

### 2.     Plaintiff Fails to Plausibly Allege That She Complained About Any *Actual* EMTALA Violation Required to Support Her EMTALA Retaliation Claim (Count 1)

Congress enacted EMTALA in response to its "concern that hospitals were 'dumping' patients [who were] unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 534 (4th Cir. 2020) (internal citations omitted).  The intent of EMTALA, therefore, was "to provide access to emergency care to all individuals *who present to an emergency department* and are determined to have an emergency medical condition, including the uninsured."  73 FR 48434-01, 48660, 2008 WL 3833378, (Aug 19, 2008) (emphasis added); *see* 42 U.S.C. §1395dd(a).

EMTALA's "avowed purpose . . . was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an 'adequate *first* response to a medical crisis' for all patients."  *Baber v. Hospital Corp. of America*, 977 F.2d

872, 880 (4th Cir.1992) (quoting 131 Cong.Rec. S13904 (Oct. 23, 1985) (statement of Sen. Durenberger) (emphasis added). "In keeping with this purpose, EMTALA imposes two main obligations on hospitals with emergency rooms.  First, EMTALA requires a hospital to screen an individual to determine whether he has an emergency medical condition . . .   Second, EMTALA requires a hospital to stabilize an individual's emergency medical condition in certain limited circumstances." *Williams*, 952 F.3d at 534 (citing 42 U.S.C. §1395dd(a)-(b)).  Once the individual is stabilized, EMTALA obligations end.  *See, e.g.*, 59 FR 32086-01, 32105, 1994 WL 272093 (June 22, 1995) (regulations rejecting the suggestion that EMTALA requires medically indicated treatment after stabilization and stating:  "[EMTALA] does not impose any requirements on hospitals with respect to the treatment or transfer of individuals whose emergency condition has been stabilized.").

"Significantly, EMTALA defines 'to stabilize' as 'to provide such medical treatment of the [emergency medical condition] as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is *likely to result from or occur during the transfer of the individual from a facility . . .*'"  *Id.* at 535 (citing 42 U.S.C. § 1395dd(e)(3)) (emphasis in original).  EMTALA's stabilization requirement, therefore, is "defined . . . *without any reference to the patient's long-term care within the system.*"  *Id.* (quoting *Bryan v. Rectors and Visitors of University of Virginia*, 95 F.3d 349, 352 (4th Cir. 1996) (emphasis added)).  In this regard, the Fourth Circuit in *Bryan* stated:

> It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient ***only in the immediate aftermath*** of the act of ***admitting her for emergency treatment*** and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that [long-term] treatment. ***It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context***.

*Id.* (emphasis added).  Thus, the Court in *Bryan* found that a hospital's entry of an anti-resuscitation order that led to an individual's death following her heart attack 12 days after she arrived at the emergency room, was not a cognizable violation under EMTALA and was appropriately dismissed on a 12(b)(6) motion because EMTALA does *not* impose an obligation to "continuously… 'stabilize' [a individual's] condition" beyond providing "immediate, emergency stabilizing treatment with appropriate follow-up."  *Id.* at 350-51.

The reason EMTALA is limited in scope to "immediate, emergency stabilizing treatment," and excludes continuous care, is simple:

> Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed *not by EMTALA* but by the state malpractice law that everyone agrees EMTALA was not intended to preempt.

*Id.* at 351 (emphasis added).

As discussed below, the young individuals at issue were not entitled, under EMTALA, to admission and continuing care in VBH's inpatient, psychiatric unit.  Thus, Plaintiff's allegations challenging the denial of in-patient admission on the grounds of "autism, out of area" are not directed to reporting any actual EMTALA violation and cannot plausibly support any EMTALA whistleblower retaliation claim.  Accordingly, Count I should be dismissed, with prejudice.

### (a)   *Reporting of an Actual EMTALA Violation is Required to State an EMTALA Whistleblower Retaliation Claim*

Section 42 U.S.C. § 1395dd(i) of EMTALA is entitled "Whistleblower protections" and provides:

> A participating hospital may not penalize or take adverse action [1] against a qualified medical person ... or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or [2] against any hospital employee because the employee reports *a violation* of a requirement of this section.

*Id.* § 1395dd(i) (emphasis added).  Plaintiff attempts to invoke the second clause of § 1395dd(i) to assert a retaliation claim against Centra under Count I.  In order to assert such a claim, Plaintiff must plausibly allege an *actual* violation of EMTALA, and as discussed herein, she has failed to do so.

Prior to joining the Supreme Court, Judge Gorsuch, writing for the Tenth Circuit, recognized that "[t]he second clause of the whistleblower protection provision permits suit only by those reporting '*a violation* of a requirement of EMTALA' [and] [n]either [clause] contemplates a cause of action for an EMTALA violation that is yet to be."  *Genova v. Banner Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) (emphasis in original).  Judge Gorsuch went on to hold, the statute's language requiring a report of an actual violation under the second clause "is plain and not absurd on its face."  *Id.* (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005).

In reaching this conclusion, Judge Gorsuch recognized that the first clause addresses *one* specific kind of potential, prospective violation because it protects those who refuse to authorize a premature or improper transfer, but the second clause, in contrast, protects *only* reporting of an actual violation.  *Id.* at 1098-99.  "The fact Congress mentioned and protected those who report *one* sort of prospective violation suggests it was well aware that those who report potential … EMTALA violations might suffer retaliation[, and] [i]t shows Congress knew well how to protect such persons if it wished to do so[, and it did not]."  *Id.* at 1099-1100.  Judge Gorsuch further found that "it's clear that Congress's purpose in EMTALA was to fire a rifle at discrete and carefully chosen targets, not to loose a federal blunderbuss in the general direction of 'patient protection."  *Id.* at 1100-01.

As discussed below, while Plaintiff may have been complaining about what she viewed as appropriate actions that should have been taken in the name of generalized "patient protection" concerns, her complaint about the alleged "autism, out of area" in-patient admission exclusion is not and was not a complaint about an actual violation of EMTALA, and therefore fails to plausibly support any claim for retaliation under EMTALA.

### (b)   EMTALA Is Triggered Only When An Individual "Comes To The Emergency Department" of the Hospital

As the statute and numerous courts, including the Fourth Circuit, have recognized EMTALA is not and cannot be triggered unless and until an "individual ... *comes to the emergency department ...*" of the hospital that is charged with violating EMTALA. *Baber*, 977 F.2d at 884 (quoting 42 U.S.C. § 1395dd(a)). In *Baber*, for example, the Fourth Circuit held that an individual in psychiatric distress who was transferred from the emergency department of one hospital, to an inpatient psychiatric ward of the receiving hospital, could not support a claim for a violation of EMTALA against the receiving hospital because EMTALA's obligations cannot and do not, as a matter of law, apply to the psychiatric ward of the transferee hospital. *Id.* Because it was "undisputed that Ms. Baber did not present herself to [the] emergency department for treatment[,] [and, instead was] admitted … to the psychiatric ward of [the transferee hospital] … [there were] no facts [that could] support Mr. Baber's claim against [the transferee hospital for a violation of EMTALA]." *Id.*

Similarly, in *Miller v. Med. Ctr. of Sw. Louisiana*, 22 F.3d 626, 627 (5th Cir. 1994), the court found that a nine-year-old child, whose leg was seriously injured in an automobile accident, could not state an EMTALA claim against another hospital that refused to accept his transfer for emergency surgical debridement on the grounds that "he had no insurance." In affirming the district court's 12(b)(6) dismissal, the Fifth Circuit held:

> Under the terms of the statute … [EMTALA] duties are only triggered when an individual "*comes to the emergency department* and a request is made on the individual's behalf for examination or treatment...." 42 U.S.C. § 1395dd (emphasis added). These two preconditions are conjunctive requiring both that an individual 1) comes to the emergency department and 2) that a request be made. In the instant case, it is the first requirement that is problematic.

*Miller*, 22 F.3d at 628. The Court recognized that "[i]t is undisputed that Nick Miller never physically came to the emergency department at Hamilton. There was only a request over a telephone [during which Hamilton denied the transfer for lack of insurance]." *Id.* The Court stated: "[W]e hold Congress to its words when it said that an individual must 'come to' the emergency department to trigger a hospital's duty under EMTALA." *Id.* at 629. Because Miller "never 'came to' the emergency department at Hamilton as required by EMTALA," the Fifth Circuit held that "Plaintiffs have failed to state a claim on which relief could be granted and the district court correctly granted Hamilton's motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Id.* at 630.

In her First Amended Complaint Plaintiff alleges that the VBH's CAPU is an inpatient, psychiatric unit. FAC at ¶ 24, Ex. A. She alleges that she reviewed the patient census for the CAPU on June 1, 2019, and discovered that emergency room physicians at two other hospitals elsewhere in Virginia had sought to transfer young patients for admission to the CAPU, but the transfers had been denied because the individuals were autistic and lived outside of the Lynchburg area. *Id.* at ¶¶ 30-31, 33.

Plaintiff, however, does not and cannot allege that these young patients "came to" VBH's emergency department. Indeed, her purported "EMTALA violation" is VBH's refusal to admit the individuals to VBH's *inpatient, psychiatric ward*. As in *Baber* and *Miller*, the allegations are wholly insufficient to support a claim of an actual violation of EMTALA, and cannot support her EMTALA whistleblower retaliation claim.

(c)     ***EMTALA Does Not Require Inpatient Admission to VBH's CAPU &
VBH's CAPU Is Not the Type of Specialized Facility Subject to
§ 1395dd(g)'s Transfer Requirement***

In an effort to shoehorn her general concern with VBH's alleged "autism, out of area"

exclusion from CAPU's inpatient facility into an EMTALA claim, Plaintiff vaguely references

EMTALA's nondiscrimination provision relating to specialized capabilities or facilities.  *See* FAC

at ¶ 128 (quoting § 1395dd(i))[3].  The CAPU, however, is not an emergency department; it is an

inpatient psychiatric ward (as in *Baber*) that is not the type of specialized, emergency care facility

subject to the transfer requirements of § 1395dd(g).

In fact, EMTALA does not require inpatient admissions, and admission of an individual as

an inpatient ends any and all obligations under EMTALA.  *See, e.g., Baber v. Hosp. Corp. of Am.*,

977 F.2d 872, 884 (4th Cir. 1992) (finding transfer and admission of an individual to a hospital's

inpatient psychiatric ward is insufficient to trigger EMTALA for the transferee hospital); *Hussain

v. Kaiser Found. Health Plan,* 914 F.Supp. 1331, 1335 (E.D.Va.1996) ("If EMTALA liability

extended to inpatient care, EMTALA would be convert[ed]...into a medical malpractice statute,

something it was never intended to be"); 73 FR 48434-01, 48661, 2008 WL 3833378 (Aug. 19,

2008) (CMS regulations "finalizing a policy that a hospital with specialized capabilities is not

required under EMTALA to accept the transfer of a hospital inpatient"); 42 C.F.R. §

489.24(a)(1)(ii) ("If the hospital admits the individual as an inpatient for further treatment, the

hospital's obligation under [EMTALA] ends"); 42 C.F.R. § 489.24(d)(2) (*generally excluding

inpatients from the stabilization requirement*s of EMTALA, and recognizing that care of inpatients

is governed by Medicare conditions of participation set forth under the Standards and

Certifications requirements of Part 482, not EMTALA).  The fact that the CAPU is an inpatient

---

[3] Plaintiff cites 42 U.S.C. § 1395dd(i) in the FAC, presumably a typo as the quote references language from 42 U.S.C.
§ 1395dd(g).

facility in and of itself demonstrates that Plaintiff cannot rely on EMTALA or §1395dd(g) to state any EMTALA claim.

In addition, the types of facilities included in § 1395dd(g) further demonstrate that the CAPU is not the type of specialized facility subject to § 1395dd(g)'s transfer requirements.  Section 1395dd(g) is titled "Nondiscrimination," and provides:

> A participating hospital that has specialized capabilities or facilities (*such as **burn units**, **shock-trauma units**, **neonatal intensive care units***, or (with respect to rural areas) regional referral centers as identified by the Secretary in regulation) shall not refuse to accept an appropriate transfer of an individual ***who requires*** such specialized capabilities or facilities if the hospital has the capacity to treat the individual. (emphasis added)

Burn units, shock-trauma units and neonatal intensive care units are exactly the type of highly specialized units that are necessary to provide "*immediate*, emergency stabilizing treatment." *Bryan*, 95 F.3d at 350-51.  The CAPU, by contrast, is not a highly specialized emergency department required for *immediate, emergency* stabilizing treatment; it is an inpatient facility to which EMTALA does not apply.  *See Baber*, 977 F.2d at 884; 42 C.F.R. § 489.24(d)(2) (generally excluding inpatients from the stabilization requirements of EMTALA); *Bryan*, 95 F.3d at 352 ("EMTALA's stabilization requirement is focused upon the patient's emergency medical condition, not the patient's general medical condition").

In essence, Plaintiff is attempting to expand the limited scope of EMTALA to require transfers, not just to the highly-specialized *emergency* units that are, in fact, *required* for immediate, emergency stabilization (like burn units, shock-trauma units and neonatal intensive care units), but to expand EMTALA's transfer obligations to any and all hospital units that may be preferred for longer-term, inpatient care—units to which EMTALA does not apply.  *See Baber*, 977 F.2d at 884 (finding an inpatient psychiatric ward to be outside the scope of EMTALA).

Try as she might, Plaintiff simply cannot convert EMTALA's rifle-shot at "discrete and carefully chosen targets [into a]…federal blunderbuss in the general direction of 'patient protection," to protect her generalized grievance with the alleged "autism, out of area" exclusion for inpatient admission to VBH's CAPU. *See Genova*, 734 F.3d at 1100-01.  Because Plaintiff fails to plausibly allege that she was retaliated against for complaining about an actual violation of EMTALA, she cannot, as a matter of law assert any EMTALA whistleblower retaliation claim against Centra.  Count I, therefore, should be dismissed with prejudice.

**3.     Plaintiff's Defamation Claim against Centra and East (Count 2) is Likewise Implausible and Not Actionable.**

In her second cause of action, Plaintiff alleges defamation by Centra and East, based on two separate statements: (1) a report by East to the Virginia Health Care Foundation, and (2) a report by East to other Centra employees.  Neither of these statements are actionable, and this count should be dismissed under Rule 12(b)(6) because the allegations do not set out the alleged defamation in *haec verba*, the statements are either true or matters of opinion, and at least one of the statements is subject to a qualified privilege that exists in the context of employment relationships, and intra-corporate statements do not constitute publication as required to assert a defamation claim.

(a)     *East's Report to the Virginia Health Care Foundation*

Plaintiff alleges that East made a "false report to the Virginia Health Care Foundation that Ms. Hartman had been fired 'for cause'," and that this statement is defamatory *per se* because it prejudices Plaintiff in her profession.  FAC ¶ 146.  Furthermore, Plaintiff claims that this statement was "not an expression of opinion, but a deliberate lie" because "East knew that Ms. Hartman's employment was terminated unlawfully and without cause because M[s]. Hartman reported EMTALA violations."  FAC ¶ 147.  Plaintiff's assertions are factually and legally misguided.

As a preliminary matter, the existence of this FAC is based on the assertion that she was terminated for cause.  FAC ¶¶ 21, 60, and ECF 1—4.  While Plaintiff may disagree with the rationale on which Centra relied in terminating her, the FAC confirms that the statements made by East to Denise Konrad are true.  *Id.*  That is, even if she disagrees with the rationale, it remains a fact that she was terminated for cause.  Although Plaintiff may not wish to acknowledge the facts and scenario surrounding her termination from Centra, she was indeed terminated "for cause."  The FAC itself and the exhibits thereto confirm this.  *Id.*  Further, Plaintiff specifically permitted East to speak with the Virginia Health Care Foundation regarding Plaintiff's employment status at Centra.  *See* **Exhibit A**.  East's correspondence with Denise Konrad were at the direction of Plaintiff and were true based on Plaintiff's own allegations and the reality of Plaintiff's termination.  The face of the FAC, therefore, reveals that Count Two is implausible to the extent it relies on East's statements to Plaintiff.

Count Two is further deficient in that Plaintiff fails to plead the "exact words" alleged to be defamatory, a longstanding and absolute requirement in Virginia.  Failure to plead the alleged defamation in *haec verba* is a fatal deficiency.  *See Ownes v. DRS Auto. Fantomworks, Inc.*, 87 Va. Cir. 30, 32 (Norfolk 2013) ("The Defendants' pleadings fail to reach the heightened pleading requirement for defamation because there is a glaring lack of exact words or phrases used by the Plaintiffs…the exact words spoken or written must be set out in the declaration in *haec verba*…words of equivalent or similar import are not sufficient.") (quoting *Morris v. Massingill*, 59 Va. Cir. 426, 428 (Norfolk 2002).

### (b)    *Report to Centra Employees*

In Count Two, Plaintiff alleges that "East also defamed Ms. Hartman by falsely reporting to Centra employees after Ms. Hartman's employment had been terminated, that Ms. Hartman was

'mentally ill', and that Ms. Hartman posed a risk of gun violence to these employees."  FAC ¶ 149. Again, this allegation does not meet the requirements to plausibly state a claim for defamation.

Virginia recognizes a qualified privileged in the context of employment relationships.  This privilege applies to statements "made between co-employees and employers in the course of employee disciplinary or discharge matters" and it can only be overcome by a showing of malice. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000) (recognizing "employment matters are occasions of privilege in which the absence of malice is presumed.").  "A communication, made in good faith on a subject in which the communicating party has an interest or owes a duty, is qualifiedly privileged if the communication is made to a party who has a corresponding interest or duty." *Jones v. Pembrooke Occupational Health, Inc.*, 26 Va. Cir. 206, 207 (Richmond City 1992) (citing *Smalls v. Wright*, 241 Va. 52, 54 (1991)).

Aside from the conclusory statement that East acted with malice, there are no facts alleged that show malice on the part of East.  Such conclusory allegations do not give rise to a pleading sufficient to overcome the qualified privilege.  *Tomlin v. IBM Corp.*, 84 Va. Cir. 280, 288 (Fairfax Co. 2012) (citing *Jarrett v. Goldman*, 67 Va. Cir. 361 (Portsmouth 2005)).

Additionally, because Centra employees are not considered third parties, the alleged statements cannot be defamatory because they were not published to third parties, as required to state a defamation claim.  *Shaheeen v. WellPoint Companies, Inc.*, 490 Fed. App'x 552, 555 (4th Cir. 2012) ("publication element of a defamation action requires dissemination of the statement to a third party in a nonprivileged context"); *Cobb v. Rector & Visitors of Univ. of Va.*, 84 F.Supp.2d 740 (W.D.Va. 2000) ("No publication occurs when the communication, which regards a matter of corporate interest, remains entirely within a corporate entity.")  So long as the subject matter of the statement relates to the job function or scope or duties to the employees who hear the statement,

there is no publication. *Montgomery Ward & Co. v. Nance*, 165 Va. 363, 380 (1935).  Here the allegation is that challenged statements were made relating to matters of safety at Centra.  Though the identity of the persons who heard the statement is not alleged, the FAC gives no indication that a discussion of safety or dangers at work would fall outside the scope of employment for whomever heard the statements at issue.

> **4.      Plaintiff's Defamation Claim against Centra and Campbell (Count 3) Fails Because Campbell's Statements Were An Opinion for A Permissible Purpose**

For her third cause of action, Plaintiff alleges that Campbell defamed her by sending a letter to the Lynchburg Police Department reporting that Plaintiff "had exhibited 'aggressive and threatening behavior towards various staff members.'"  FAC ¶¶ 154, 158-59.  Yet again, Plaintiff's pleadings under this count are fatally flawed and should be dismissed under Rule 12(b)(6).

Virginia recognizes a qualified privilege in the context of employment relationships.  This privilege applies to statements "made between co-employees and employers in the course of employee disciplinary or discharge matters" and it can only be overcome by a showing of malice. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000) (recognizing "employment matters are occasions of privilege in which the absence of malice is presumed.").

In order to be "actionable," a statement must be both "false and defamatory." *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015).  Because statements of opinion cannot be "false," they are never actionable. *See Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 (2003) ("Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion.") (internal citation omitted).  Plaintiff may assert that the alleged defamatory statement contains a "factual kernel…which can be objectively proven to be true or false." *Lamb v. Weiss*, 62 Va. Cir. 259 (2003).  But where a statement with even some apparent basis in fact turns on a subjective judgment, it still qualifies as an opinion. *See Raytheon Tech. Servs. Co. v. Hyland*, 273

Va. 292, 305 (2007) (holding that it is a statement of opinion – not a statement of fact – to criticize an employee for being "frequently verbose and vocal in her opinions," since "the negative conduct, and whether and how often it occurred, is a matter of the speaker's perspective").

Finally, contrary to Plaintiff's baseless assertions that these statements are *per se* defamatory, it is indisputable that the alleged defamatory statements do not prejudice Plaintiff in her profession and are therefore not defamatory *per se*.  These statements were not made to any potential employer, but instead were made to the LPD in order to communicate information necessary to ensure that the LPD was prepared in the event Plaintiff did not comply with Centra's instructions that Plaintiff remain off Centra's property.  Outside of instances of *per se* defamation, damages are not presumed.  *See Fleming v. Moore*, 221 Va. 884, fn. 4 (1981) ("The presumption of damages is the critical distinction between defamation *per se* and other actions for defamation.").  Therefore, even if the statements were defamatory, which they are not, Plaintiff's third cause of action must be dismissed because Plaintiff has not identified any damages connected to the statements.  *See WJLA-TV v. Levin*, 264 Va. 140, 164 (2002) ("in the absence of evidence that he personally suffered actual damages as a result of the defamation, the plaintiff was entitled to recover nothing.").

### 5.    Plaintiff Fails to State a Claim for Wrongful Termination by Centra in Violation of Public Policy (Count 4)

Finally, Plaintiff's claim for wrongful termination in violation of public policy must be dismissed pursuant to Rule 12(b)(6) because wrongful termination is a "very limited" exception to the at-will employment doctrine that applies in only three instances, none of which are plausibly alleged here.

Plaintiff's claim is based on *Bowman*, 229 Va. at 539-540, 331 S.E.2d 797, which recognized a state law claim for wrongful termination under certain, limited circumstances.  "[A] claim under *Bowman* 'must find root in a state statute[]'; it cannot have its genesis in an act of Congress."  *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 450-51 (E.D. Va. 2002) (quoting *McCarthy v. Texas Instruments, Inc.*, 999 F. Supp. 823, 829 (E.D. Va. 1998)); *see also Oakley v. The May Department Stores, Co.*, 17 F. Supp. 2d 533, 536 (E.D. Va. 1998) (explaining that "Title VII [of Civil Rights Act of 1964] cannot be used to support a *Bowman* claim, because the *Bowman* exception … is predicated on public policies derived from Virginia statutes, not federal laws.") (citations omitted).  Plaintiff cannot premise her wrongful termination claim on EMTALA, a federal statute, so she attempts to pull her claim into a *Bowman* claim by alleging that an EMTALA violation constitutes a violation of Code of Virginia § 32.1-125.4.  .However, based on Plaintiff's own allegations contained in the FAC, this section of Virginia Code is inapplicable to VBH's CAPU, and therefore Plaintiff's claim founded thereon fails as a matter of law.

According to the Code of Virginia, "[t]he provisions of §§ 32.1 – 123 through 32.1 - 136 shall not be applicable to:…(ii) an institution *licensed by the Department of Behavioral Health and Developmental Services*."  VA. CODE § 32.1-124 (emphasis added).  Plaintiff's own allegations confirm that "Centra's secure psychiatric units are licensed by the Virginia Department of Behavioral Health and Developmental Services."  FAC ¶ 25.  Accordingly, based on Plaintiff's own allegations and Virginia Code § 32.1-124, Virginia Code § 32.1-125.4 does not and was not intended to apply to VBH's CAPU.  Thus, there can be no violation of § 32.1-125.4 and this inapplicable statute cannot form the basis of any *Bowman* claim.

Second, even if EMTALA could serve as the basis for a state law wrongful termination claim (and it cannot, as a matter of law). Plaintiff's claim would fail for the same reasons her EMTALA whistleblower retaliation claim (Count 1) fails.

Third, wrongful termination claims can only arise in three, limited instances: "(1) where 'an employer violated a policy enabling the exercise of an employee's [Virginia] statutorily created right[]'; (2) where 'the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy[]'; and (3) where 'the discharge was based on the employee's refusal to engage in a criminal act.'" *Storey*, 207 F. Supp. 2d at 451 (quoting *Rowan*, 263 Va. 209).

In this instance, Centra did not violate any policy enabling the exercise of any of Plaintiff's statutorily created rights because, as stated above, Virginia Code § 32.1-125.4 does not reflect a policy applicable to VBH's CAPU.  Furthermore, if basing her claim for wrongful termination on the EMTALA statute (which is cannot support a claim for the reasons discussed above), Plaintiff nonetheless was not an individual seeking medical care and therefore was not a member of the class of persons intended to be protected by EMTALA.  Finally, it is clear that Centra's termination of Plaintiff's employment was in no way connected to any refusal by Plaintiff to engage in a criminal act.  Therefore, Plaintiff's claim for wrongful termination cannot fall within any of the three situations wherein such claims are permitted.

Plaintiff, therefore, fails to plausibly plead any claim for wrongful termination against Centra, and Count 4 must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss Plaintiff's FAC with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6), and award them such other relief as this Court may deem just and proper.

Dated:  September 1, 2020                    Respectfully submitted,

                            /s/ J. Walton Milam III
                            Joshua F. P. Long (VSB No. 30285)
                            Joshua R. Treece (VSB No. 79149)
                            J. Walton Milam, III (VSB No. 89406)
                            Woods Rogers PLC
                            P.O. Box 14125
                            10 South Jefferson Street, Suite 1400
                            Roanoke, Virginia 24038-4125
                            Telephone: (540) 983-7600
                            Facsimile: (540) 983-7711
                            jlong@woodsrogers.com
                            jtreece@woodsrogers.com
                            wmilam@woodsrogers.com

                            *Defendants Centra Health, Inc., Stephanie*
                            *East, and Nathan Campbell*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 1st day of September 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notice to the following counsel of record:

M. Paul Valois, Esq.
JAMES RIVER LEGAL ASSOCIATES
7601 Timberlake Road
Lynchburg, VA 24502
Phone: 434-845-4529
Fax:    434-845-8536
mvalois@vbclegal.com

*Counsel for Plaintiff Kimberly Hartman*

_____/s/ J. Walton Milam III_____.