**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| **KIMBERLY HARTMAN,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CENTRA HEALTH, INC.,** | : | CASE NO.  6:20CV00027 |
| | : | |
| **STEPHANIE EAST,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **NATHAN CAMPBELL** | : | |
| *Defendants*. | : | |

**PLAINTIFF KIMBERLY HARTMAN'S MEMORANDUM IN OPPOSITION TO DEFENDANTS CENTRA HEALTH, INC, STEPHANIE EAST  AND NATHAN CAMPBELL'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendants Centra Health, Inc. ("Centra"),  Stephanie East ("East") and Nathan Campbell ("Campbell") and, collectively, ("Defendants"), seek dismissal of the First Amended Complaint ("FAC") (Dkt. 17) pursuant to Rule 12(b)(6).   Plaintiff Kimberly Hartman ("Ms. Hartman"), by counsel, tenders this Amended Memorandum[1] in Opposition to Defendants Centra Health, Inc., Nathan Campbell, and Stephanie East's Motion To Dismiss Plaintiff's First Amended Complaint (Dkt. 26) and the Memorandum in Support of Defendants Centra Health, Inc., Nathan Campbell, and Stephanie East's Motion To Dismiss Plaintiff's First Amended Complaint ("Defendants' Memorandum") (Dkt. 27) to-wit:

**LEGAL STANDARD**

"A motion to dismiss can only be granted if there is no set of facts that would entitle plaintiffs to a verdict on the claims in issue. Applicable standards state that the facts alleged in

---

1   The sole amendment is the attachment of Exhibit 1 which was inadvertently omitted when the original Memorandum was filed.

the complaint are accepted as true." *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974); *Franks v. Ross*, 313 F.3d 184,192 (4th Cir. 2002). "In addition, all reasonable inferences must be made in favor of plaintiffs. *Johnson v. Mueller*, 415 F.2d 354 (4th Cir. 1969);  *MacKethan v. Peat. Marwick. Mitchell & Co.*, 439 F. Supp. 1090 (E.D. Va. 1977).  A claim has facial plausibility when the plaintiff pleads enough factual content that allows the court to draw the reasonable inference that the defendant is liable under the alleged claim." Id., citing *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)

## ARGUMENT

The Defendants' Memorandum fails in several ways.  Specifically, it: (i) presents extraneous allegations of fact that are not properly considered under Rule 12(b)(6); (ii) mischaracterizes both Ms. Hartman's and the Defendants' own factual allegations; and (iii) misconstrues and misrepresents both statutory and case law with regard to the EMTALA (42 U.S.C. ¶ 1395dd).

## I. THE DEFENDANTS PLEAD AND RELY ON FACTS OUTSIDE OF THE FIRST AMENDED COMPLAINT

Despite their commitment to rely solely upon "the facts arising from the FAC and documents referenced therein" (Defendants' Memorandum. p. 3, FN 1), the Defendants present a purported "factual history" embellished with several allegations and exhibits that lie outside of the First Amended Complaint.  Specifically, they relate the following factual allegations, none of which are to be found in the First Amended Complaint:

- That Michael Judd was Ms. Hartman's supervisor.  (Defendants' Memorandum, p. 3)
- That  Ms. Hartman "permitted the Virginia Health Care Foundation to speak with East" about Ms. Hartman's employment status.  (Ibid., p. 3)

- That the Defendants' "Exhibit A" (Dkt 27-1) substantiates the claim that Ms. Hartman authorized the Virginia Health Care Foundation to speak with East". Ibid.

- That East spoke with Denise Konrad pursuant to Ms. Hartman's release. Ibid.

- That Ms. Hartman lied to Denise Konrad by reporting that she resigned from Centra because her position took too much of her time. Ibid., p. 4

- That a purported email confirms that Ms. Hartman lied to Denise Konrad. Ibid.

- That Nathan Campbell's purpose in transmitting a false and defamatory letter to the Lynchburg Police Department was so that LPD could be aware that the letter was sent. Ibid., p. 5

- The Nathan Campbell's allegation that Ms. Hartman had engaged in aggressive and threatening behavior was a statement of opinion. Ibid.

While the Defendants concede that the extraneous factual allegations are unnecessary for consideration by the Court, they do not state their purpose in submitting them. Furthermore, despite their concession, they employ these extraneous allegations extensively throughout their arguments.

Rule 12(d) provides that when a Rule 12(b)(6) motion presents matters outside the pleadings, (i) the Rule 12(b)(6) motion should be treated as a Rule 56 motion for summary judgment and (ii) the parties be given a reasonable opportunity to present evidence. In applying the rule, if the Defendants' Rule 12(b)(6) motion is converted to a Rule 56 motion, substantial discovery will be necessary to afford such a reasonable opportunity to the parties.

## II. MS. HARTMAN STATED A VALID WHISTLEBLOWER CLAIM UNDER THE EMTALA

The Defendants rely on a false premise when they assert that Centra's failure to admit emergent juvenile patients for psychiatric stabilization did not violate the EMTALA because Ms. Hartman "... does not and cannot allege that these young patients 'came to'"VBH's emergency department." Defendants' Memorandum, p.11.  There are two rather glaring problems with this false assertion:

1. Virginia Baptist Hospital ("VBH") does not have an emergency department.

2. Participating hospitals are required to accept emergent transfer patients for stabilization in specialized units "<u>regardless of whether the hospital has a dedicated emergency department</u>."   CFR §489.24(f)(1) (emphasis added)

Clearly, the plain language of the EMTALA lays waste to the Defendants' claim that the transfer provisions pertain only to hospital emergency rooms.  The Defendants either misunderstand or misrepresent the duty of a participating hospital to accept emergent transfer patients under the EMTALA.  It is true that a patient must generally present to an emergency room of a hospital to invoke EMTALA protection,[2] but this emergency room can be located in <u>any</u> hospital anywhere in the United States.  Once a patient presents to any emergency room of <u>any</u> hospital (the transferring hospital), if stabilization of the patient requires specialized care that the transferring hospital lacks, then another participating hospital (the receiving hospital) cannot refuse transfer admission for stabilization of the patient if the receiving hospital has both the capability and the capacity to stabilize the patient.

---

2   The EMTALA provides several exceptions to this general requirement that are not relevant to this case.

So, with regard to the sufficiency of Mr. Hartman's claim of retaliation for her report of an EMTALA violation, the two main issues to be resolved are (i) whether Ms. Hartman alleged sufficient facts to allow a factfinder who accepts her allegations to conclude that Centra violated the EMTALA and (ii) whether Ms. Hartman alleged sufficient facts to allow the same factfinder to conclude that Centra retaliated against her for reporting the EMTALA violations.

### A.  CENTRA VIOLATED THE EMTALA

To determine whether Centra violated the EMTALA by refusing transfer admission to the juvenile patients who were the subject of Ms. Hartman's complaint, the following questions need to be answered affirmatively.

- Did the juvenile patients present to <u>any</u> emergency room of a transferring hospital in the United States and thereby invoke the protections of the EMTALA?

- Is the Child and Adolescent Psychiatric Unit of Virginia Baptist hospital a "specialized capability or facility" of a participating hospital as contemplated by the EMTALA?

- Did the transferring hospital request a transfer of the juvenile patients for stabilization to Virginia Baptist Hospital?

- Did Virginia Baptist Hospital have the capability and the capacity to stabilize the juvenile patients?

- Did Centra refuse transfer admission to the juvenile patients?

The answer to each of these questions is "yes" and so Ms. Hartman has plausibly alleged a clear violation of the EMTALA .  Running through these questions (and their affirmative answers) in order:

**Did the juvenile patients present to <u>any</u> emergency room of a transferring hospital in the United States and thereby invoke the protections of the EMTALA?** <u>Yes</u>. Ms. Hartman alleged with particularity that "[u]pon review of the transfer requests from the previous day, Ms. Hartman discovered that <u>emergency room physicians at two other hospitals</u> elsewhere in Virginia had sought to transfer young patients suffering from psychiatric emergencies to the Child and Adolescent Psychiatric Unit for stabilization, but that each of these young patients had been denied admission." (FAC ¶ 31) (emphasis added)

**Is the Child and Adolescent Psychiatric Unit of Virginia Baptist hospital a "specialized capability or facility" of a participating hospital as contemplated by the EMTALA?** <u>Yes</u>. The Defendants contend that the Unit is not subject to the EMTALA because it is an inpatient unit. However, the defendants cite to the non-exclusive examples of <u>inpatient units</u> specifically provided in the EMTALA's transfer provision (burn units, shock-trauma units and neonatal intensive care units). Defendants' Memorandum, p. 13  Clearly, there is no general exemption of inpatient facilities from the EMTALA as the Defendants claim there is. Indeed, there can be no such exemption because, as noted above, the transfer provision of the EMTALA applies to participating hospitals <u>even when they lack emergency rooms.</u>

The Centers for Medicare and Medicaid Services ("CMS") provides guidance on the question of transfer to psychiatric units. A copy of this guidance is attached hereto and incorporated herein as **EXHIBIT 1**. The front page of this guidance plainly states the obligation of participating hospitals to accept emergent psychiatric patients for screening and stabilization:

> Medicare-participating hospitals, including psychiatric hospitals, are required to
> comply with EMTALA. The requirements are consistently applied in hospitals
> and critical access hospitals with emergency departments and labor and delivery

departments. At times, however, there is confusion or misconceptions regarding EMTALA obligations in psychiatric hospitals.

The attached Frequently Asked Question document addresses common inquiries specific to EMTALA compliance in psychiatric hospitals. Intake or assessment areas in psychiatric hospitals may meet the threshold of "dedicated emergency department" as defined in the EMTALA regulations at §489.24(b) and be required to meet EMTALA screening and stabilization requirements. <u>In addition, since psychiatric hospitals offer specialized services, they are required to meet the recipient hospital requirements at §489.24(f</u>). (emphasis added)

In turn, CFR §489.24(f) lays out the duty to accept transfer patients from the emergency rooms of other hospitals:

(f) **Recipient hospital responsibilities**. A participating hospital that has specialized capabilities or facilities (including, but not limited to, facilities such as burn units, shock-trauma units, neonatal intensive case units, or, with respect to rural areas, regional referral centers (which, for purposes of this subpart, mean hospitals meeting the requirements of referral centers found at § 412.96 of this chapter)) may not refuse to accept from a referring hospital within the boundaries of the United States an appropriate transfer of an individual who requires such specialized capabilities or facilities if the receiving hospital has the capacity to treat the individual.

(1) <u>The provisions of this paragraph (f) apply to any participating hospital with specialized capabilities, regardless of whether the hospital has a dedicated emergency department</u>… (emphasis added)

There is no question that the Child and Adolescent Psychiatric Unit (the "Unit") at Virginia Baptist Hospital has the "specialized capabilities" that subject it to the non-discrimination provision of the EMTALA.  As the First Amended Complaint alleges, the Unit is one of only two private psychiatric units in Virginia capable of handling young psychiatric patients.  (FAC, ¶ 24) The first purpose listed on the Unit's Scope of Services is "[t]o provide psychiatric stabilization." (FAC, Exhibit A) (Dkt. 17-1)  Centra even advertises this purpose on the Unit's website: "[w]e provide short-term (4-6 day average) inpatient care for children and adolescents ages 5-18 <u>in</u>

need of immediate stabilization to help with severe emotional or behavioral problems."[3] (emphasis added)

**Did the transferring hospital request a transfer of the juvenile patients for stabilization to Virginia Baptist Hospital?** Yes. Ms. Hartman directly alleged that Centra refused transfer admissions to two children in dire need of psychiatric stabilization. (FAC ¶ 31)

**Did Virginia Baptist Hospital have the capability and the capacity to stabilize the juvenile patients?** Yes. Ms. Hartman alleged that when she discovered that children were unlawfully denied transfer admission for stabilization, her unit had a low patient census. (FAC, ¶ 30) After she discovered that children had been denied transfer admission to her Unit, she took charge and made arrangements for the admission of one of the children to the Unit.[4] (FAC, ¶ 41) Clearly, the Unit had both the capability and the capacity to stabilize these children when Centra denied transfer admission to them.

**Did Centra refuse transfer admission to the juvenile patients?** Yes. Indeed, Ms. Hartman alleges that Centra admitted denying transfer admission to these children and attributed this EMTALA violation to "confusion" by its staff regarding admission and exclusion criteria. (FAC, ¶ 37) This admission, made in the Plan of Correction that Centra submitted to regulators, is a matter of public record.

The Defendants resort to a litany of inapposite cases in their scramble to dodge Centra's EMTALA liability. The dates of these cases are important, as the transfer requirements of the EMTALA (§489.24 (f)) were substantially amended in 2006 to apply to all participating hospitals, specifically including those that lacked emergency rooms. None of the cases cited by

---

[3] The Unit's web page is located at https://www.centrahealth.com/services/centra-acute-child-adolescent-psychiatric-unit

[4] The other child was transferred to another facility after Centra refused to admit the child.

the Defendants address the pertinent issue; namely, the duty of specialized participating hospital units under the EMTALA to accept transfers of patients for stabilization:

- *Williams v. Dimensions Health Corp.*, 952 F.3d 531 (4th Cir. 2020)   This case has nothing to do with a hospital's refusal to accept transfers under the EMTALA.  It addresses the claims of a patient <u>who was admitted</u> to a hospital, but who asserted that the hospital did not properly screen him before admitting him.  The issue presented was whether the hospital admitted the patient in good faith.  This issue has no bearing on the instant case, as both the juvenile psychiatric patients in the instant case were screened in emergency rooms and were <u>refused admission</u> by Centra.

- *Baber v. Hospital Corp. of America*, 977 F.2d 872 (4th Cir. 1992)  This case predates the amendment of the EMTALA's transfer provisions and also has nothing to do with accepting transfers to specialized units under the EMTALA.  Instead, the issue presented in *Baber* was the propriety of a <u>completed</u> transfer and admission to an inpatient unit alleged to have occurred without the screening or stabilization demanded by the EMTALA.  *Baber* did not, as Defendants argue, determine "an inpatient psychiatric ward to be outside the scope of the EMTALA."  (Defendants' Memorandum, p. 13).  Instead, *Baber* held that since a patient was <u>directly admitted</u> to a psychiatric unit of a transferee hospital upon transfer from another hospital, <u>after being properly screened</u> at the transferring hospital's emergency room and <u>after it was determined that the patient did not require emergency stabilization</u>, the EMTALA did not apply to the admission to the inpatient unit.

PAGE 9 of 19

- *Bryan v. Rectors and Visitors of University of Virginia,* 95 F.3d 349 (4th Cir. 1996) *Bryan,* another case that predates the amendment of the EMTALA transfer provisions, involved a patient who was transferred to UVA hospital and who died after twelve days of stabilization and after the hospital issued a DNR order. The issue was whether the EMTALA operated to override the hospital's DNR order. This case has nothing to do with the duty of a hospital to accept a transfer patient into a specialized unit under the EMTALA.

- *Genova v. Banner Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) Aside from the fact that *Genova* was an EMTALA whistleblower case, it has no bearing on Ms. Hartman's claim, as the issue was whether an EMTALA violation occurred in a case of "patient hoarding," which Judge Gorsuch described as the "inverse" of the EMTALA's anti-patient dumping provisions. This case had nothing to do with a hospital refusing to accept transfer patients.

- *Miller v. Med. Ctr. of Sw. Louisiana,* 22 F.3d 626, 627 (5th Cir. 1994) *Miller,* a case that predated the amendment to the EMTALA's transfer provisions, did not address the issue of transfer admission. Indeed, the court specifically declined to do so. The issue decided in *Miller* was that since the patient had <u>never been to any emergency room at all</u>, the EMTALA did not operate to require another hospital to accept a patient because the plain language of the EMTALA operates only to protect patients who present to an emergency room. Instead of reporting to an emergency room, the patient in *Miller* was taken from the scene of an automobile accident to a "small, country clinic where only two family doctors practice" that lacked an emergency room and where a doctor sought to admit the

patient to another hospital for surgery. *Miller, supra* (FN 2) In contrast to these circumstances, the juvenile psychiatric patients in the instant case whose EMTALA rights Centra violated reported to emergency rooms for treatment and were therefore protected by the EMTALA.

- *Hussain v. Kaiser Found. Health Plan,* 914 F.Supp. 1331, 1335 (E.D.Va.1996) *Hussain* involved an alleged failure to stabilize a patient <u>before admitting</u> the patient. It had nothing to do with a hospital's refusal to accept transfer patients.

  **B. CENTRA RETALIATED AGAINST MS. HARTMAN FOR HER REPORT OF EMTALA VIOLATIONS**.

The Defendants assiduously avoid addressing Ms. Hartman's detailed and specific allegations of heinous retaliation for reporting the EMTALA violation. She alleges that Centra was not satisfied with simply unlawfully firing her, but embarked on a vicious campaign to derail her education, destroy her career and to harm her family in retaliation for reporting the EMTALA violation. Ms. Hartman has stated a plausible claim of retaliation under the EMTALA.

**III. MS. HARTMAN PLAUSIBLY STATED DEFAMATION CLAIMS AGAINST CENTRA AND STEPHANIE EAST**

The Defendants provide five arguments in support of their motion to dismiss Ms. Hartman's defamation claims against Centra and Stephanie East (Count 2 of the First Amended Complaint). These arguments are:

1. That East's report to the Virginia Health Care Foundation that Ms. Hartman had been fired by Centra "for cause" was true. (Defendants' Memorandum, p. 15)

2. That Ms. Hartman "specifically permitted East to speak with the Virginia Health Care Foundation regarding Plaintiff's employment status at Centra" and that "East's correspondence with Denise Konrad were at the direction of Plaintiff." Ibid.

3. That Ms. Hartman has failed to plead the "exact words" East used in defaming her. Ibid.

4. That East's reports to Centra employees that Ms. Hartman was "mentally ill" and that she posed a risk of gun violence are protected by qualified privilege. Ibid. p. 15

5. That Ms. Hartman has not sufficiently alleged facts to show the malice on East's part necessary to overcome her qualified privilege with regard to the statements she made about Ms. Hartman to Centra employees. Ibid.

With regard to the first of these purported grounds, the Defendants simply state their own factual allegation (that Ms. Hartman was fired for cause) instead of fulfilling their promise to rely solely on the allegations in Ms. Hartman's First Amended Complaint. Thus, this argument is not properly considered under Rule 12(b)(6). With regard to substance of the Defendants' argument, Ms. Hartman directly alleged that she was terminated because Centra determined that it was "in everyone's best interest to end our working relationship." (FAC, ¶ 61) She also alleged that the only action of hers mentioned in her termination email was her report of the EMTALA violation. (FAC, ¶ 62) Ms. Hartman attached and incorporated a copy of the email notifying her of the termination of her employment and it plainly states that Ms. Hartman was being terminated only because Centra determined that termination was in "everyone's best interest." (FAC, Exhibit D) (Dkt. 17-4) There is nothing in Ms. Hartman's First Amended Complaint to support any allegation that she was terminated for cause.

Ms. Hartman never specifically permitted East (or anyone else) to speak with anyone at the Virginia Health Care Foundation and the Defendants' claim to the contrary is false. Instead, Ms. Hartman merely authorized Centra to provide limited information in response to the Virginia Health Care Foundation's single written request. The Defendants' attempt to stretch this limited authorization to a "direction" from Ms. Hartman to East to speak to anyone is disingenuous.

Turning to the issue of the necessity to plead the exact words East used to defame her, Ms. Hartman has done precisely that. She alleged that East falsely and maliciously reported that she had been terminated "for cause" and that East did so deliberately to interfere with her education in retaliation for making an EMTALA complaint. (FAC ¶¶ 79-81) Ms. Hartman also alleged that East tried to cover-up her defamation. (FAC, ¶¶ 82-84) With regard to the statements made to Centra employees, Ms. Hartman alleged that East told Centra employees that Ms. Hartman was mentally ill and that she posed a danger of gun violence. (FAC, ¶ 149)

"Communications between persons on a subject in which the persons have an interest or duty are occasions of privilege. However, the privilege attaching to such occasions is a qualified privilege which may be defeated if the plaintiff proves that the defamatory statement was made maliciously." *Larimore v. Blaylock*, 528 S.E.2d 119, 259 Va. 568 (2000) citing *Chalkley v. Atlantic Coast Line R.R. Co.*, 150 Va. 301, 306, 143 S.E. 631, 632 (1928) There is no absolute intra-corporate immunity in employment cases. Ibid.

The Defendants argue that Ms. Hartman did not allege facts sufficient for a jury to find that either Centra or East acted maliciously. In fact, Ms. Hartman alleged with specificity that:

- East dismissed Ms. Hartman from a meeting and told her not to return to work immediately after Ms. Hartman told East that she would not participate in a cover-up of Centra's EMTALA violation. (FAC, ¶¶ 54, 55)

- Centra sent armed guards to Ms. Hartman's home to beat on her door for more than half an hour with the intent to intimidate her. (FAC, ¶¶ 63, 64)

- Centra employees altered documents to cover-up Ms. Hartman's EMTALA complaint and lied to VDH surveyors about the documents. (FAC, ¶¶ 69-73)

- East, acting at Centra's behest, deliberately lied to Denise Konrad at the Virginia Health Care Foundation in retaliation for Ms. Hartman's EMTALA complaint when neither East nor Centra had any legitimate interest in Ms. Hartman's scholarship. (FAC, ¶¶ 76-78)

- When East learned that Denise Konrad had communicated with Ms. Hartman about East's false report of being fired "for cause," East requested that Denise Konrad relate the nature of her communication with Ms. Hartman and then asked Ms. Konrad to hide East's email threads from Ms. Hartman. (FAC, ¶¶ 81-84)

- Centra wrongfully recouped money from Ms. Hartman's final paycheck after deciding to smear Ms. Hartman instead of paying her off. (FAC, ¶¶ 87-91)

- Centra retaliated against Ms. Hartman by interfering with the treatment of her daughter. (FAC, ¶¶ 92-97)

- Centra attempted to have Ms. Hartman prosecuted on false charges of embezzlement. (FAC, ¶104)

- Centra attempted to strip Ms. Hartman of her nursing license by making a false complaint to the nursing board. (FAC, ¶¶ 107-109)

- Centra's employees abused and defamed Ms. Hartman in a malicious campaign to destroy her in retaliation for her EMTALA complaint. (FAC, ¶¶ 115-125)

East made her defamatory comments to Centra employees <u>after</u> Ms. Hartman had been terminated. Any jury accepting the facts alleged by Ms. Hartman will have no trouble concluding that Centra and East acted not just maliciously, but viciously, against her. Neither East nor Centra are entitled to assert a qualified privileged in Count 2.

## IV. MS. HARTMAN PLAUSIBLY STATED A DEFAMATION CLAIM AGAINST CENTRA AND CAMPBELL

The Defendants assert many of the same arguments in their attempt to dismiss Count 3 against Centra and Campbell that they used in their attempt to dismiss Count 2. These arguments have been refuted. Additionally, the Defendants assert that:

- Campbell's statement that Ms. Hartman "exhibited aggressive and threatening behavior towards staff members" is non-defamatory expression of opinion. (Defendants' Memorandum, p. 17)

- That Campbell published his statement to the LPD solely for purpose of ensuring that LPD was "prepared" in the event that Ms. Hartman trespasses on Centra property in the future. Ibid.

- Ms. Hartman was not damaged in her professional reputation by Campbell's statements, so they are not defamatory *per se*. Ibid.

- Ms. Hartman did not allege damages. Ibid.

A claim that any person exhibited "aggressive and threatening behavior to staff members" is not an expression of opinion, but instead an allegation of fact that implies a purported observation of events and people. Campbell never observed anything and, consequently, he was

never able to form any opinion of his own regarding Ms. Hartman's conduct. There is no allegation that he observed or investigated anything, and there are no facts alleged that he was able to form or express any opinion regarding anything Ms. Hartman did or said. Once again, the Defendants employ their own factual allegations instead of confining themselves to Ms. Hartman's allegations.

Campbell did not simply transmit a banning notice to LPD. He transmitted the false allegations directly to LPD, where they became public records subject to production upon demand by operation of law. If Campbell's intent was merely to place LPD officers on notice that Ms. Hartman was not permitted on Centra property, then there was no need to transmit the defamatory statements at all. Instead, Campbell transmitted these defamatory statements to "prepare" the LPD officers to believe that Ms. Hartman was aggressive and dangerous.

Ms. Hartman is a psychiatric nurse who routinely deals with law-enforcement officers in her professional capacity as a manager of psychiatric units. Thus, Campbell's false statements to the LPD were deliberately intended to damage Ms. Hartman's reputation. However, the issue of whether or not Campbell's statements were defamatory *per se* needs not be addressed at this point because Ms. Hartman alleged damages. (FAC, ¶ 126)

## V. MS. HARTMAN PLAUSIBLY STATED A *BOWMAN*[5] CLAIM FOR UNLAWFUL TERMINATION OF HER EMPLOYMENT BY CENTRA

The Defendants present three claims in support of their argument that Ms. Hartman did not state a plausible *Bowman* action (Count 4 of the First Amended Complaint) for unlawful termination of employment by Centra:

---

5   *Bowman v. State Bank of Keysville,* 331 S.E.2d 797 (Va. S. Ct., 1985)

1. That her *Bowman* claim must "find root" in a Virginia statute instead of the EMTALA. (Defendants' Memorandum, p. 20)

2. That even if EMTALA could support a *Bowman* claim, it would fail because her EMTALA claim is invalid. (Defendants' Memorandum, p. 21)

3. That she is not protected by the EMTALA and Centra did not violate any public policy. Ibid.

The Defendants are correct that Ms. Hartman's *Bowman* claim must be based on Virginia law. However, the Virginia law subsumes the EMTALA in hospital whistleblower actions, as Code of Virginia § 32.1-125.4 provides that:

> **No hospital may retaliate** or discriminate **in any manner against any person who** (i) in good faith complains or provides information to, or otherwise cooperates with, the Department or any other agency of government or any person or entity operating under contract with an agency of government having responsibility for protecting the rights of patients of hospitals, or (ii) **attempts to assert any right protected by** state or **federal law**. (emphasis added)

Ms. Hartman plainly asserted her right (and what she felt to be her duty) to blow the whistle on Centra's EMTALA violation. Thus, EMTALA does in fact support a *Bowman* wrongful discharge claim by application of Virginia law.

The Defendants cite to Code of Virginia § 32.1-124 to contend that the secure psychiatric units at VBH are "institutions" licensed by the Virginia Department of Behavioral Health and Developmental Services, thus rendering Centra exempt from the the anti-retaliation provisions of Code of Virginia § 32.1-125.4. Of course, this argument fails from the gate as the very essence of Ms. Hartman's complaint was that the children were <u>never admitted</u> to the secure psychiatric units but were denied admission by the hospital. This argument also fails because "hospitals" are not "institutions" as contemplated by Virginia law. Instead, the word "institution," as used in the

exemption language of Code § 32.1-124, clearly refers to mental institutions licensed by DBHDS, not hospitals. Indeed, Code of Virginia § 37.2-100 specifically distinguishes between hospitals and institutions when it defines a "licensed hospital" to mean a "hospital or institution, including a psychiatric unit of a general hospital, that is licensed pursuant to the provisions of this title." (emphasis added). Thus, while a licensed mental institution is defined by statute to be a "licensed hospital" for the purposes of DBHDS regulation, the converse is not true – a hospital (or a unit of hospital) is not deemed to be a DBHDS "institution."

The Defendant's second contention (that Centra did not commit an EMTALA violation) has been thoroughly refuted. Ms. Hartman plausibly alleged that Centra committed a flagrant EMTALA violation and retaliated against her. This retaliation is itself an EMTALA violation.

The Defendants third contention (that Ms. Hartman is not a member of the class of persons protected by the EMTALA) is refuted in the plain language of 42 U.S. Code § 1395dd(i):

> **(i) WHISTLEBLOWER PROTECTIONS**
>
> **A participating hospital may not penalize or take adverse action** against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or **against any hospital employee because the employee reports a violation of a requirement of this section.** (emphasis added)

Thus, Ms. Hartman has plausibly alleged a *Bowman* wrongful discharge claim.

## CONCLUSION

For all of the foregoing reasons, the Defendants' Rule 12(b)(6) Motion to Dismiss should be overruled. If the Court is inclined to convert the Motion to a Rule 56 Motion for Summary Judgment, Ms. Hartman is entitled to ample discovery to present evidence for the Court's consideration.

Respectfully submitted,

**KIMBERLY HARTMAN**
By Counsel

By: **/s/ M. Paul Valois**
    **M. Paul Valois (VSB No. 72326)**
    **Counsel for Plaintiff**
    **JAMES RIVER LEGAL ASSOCIATES**
    **7601 Timberlake Road**
    **Lynchburg, Virginia 24502**
    **Telephone: (434) 845-4529**
    **Facsimile: (434) 845-8536**
    **[Email: mvalois@vbclegal.com]**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2020, I electronically filed the foregoing Memorandum with the Clerk of this Court using the CM/ECF system, which will automatically send notice of this filing to all counsel of record.

/s/ M. Paul Valois