CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

7/23/2021
JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| KIMBERLY HARTMAN,<br>*Plaintiff*, | CASE NO. 6:20-cv-00027 |
| v. | MEMORANDUM OPINION |
| CENTRA HEALTH, INC., *et al.*,<br>*Defendants*. | JUDGE NORMAN K. MOON |

In June 2019, Centra Health, Inc. terminated its employee, Kimberly Hartman, a licensed registered nurse, who managed Virginia Baptist Hospital's Child and Adolescent Psychiatric Unit. Hartman alleges that Centra retaliated against her after she reported her concerns about the unlawful denial of certain transfer patient admissions to the unit she managed. Specifically, Hartman contends that Centra violated the whistleblower protection provision of the Emergency Medical Treatment and Labor Act (Count I) and wrongfully terminated her employment in violation of public policy under Virginia law (Count IV). Dkt. 17. Hartman also claims that Centra, Centra's Vice President of Behavioral Health Stephanie East, and Centra's Director of Security Nathan Campbell made defamatory statements about her following her termination (Counts II and III). *Id.* Centra, East, and Campbell have moved to dismiss all claims against them under Federal Rule of Civil Procedure 12(b)(6). Dkt. 26.

For the reasons below, the Court will deny the motion to dismiss with respect to Counts I, II, and IV, but will grant the motion with respect to Count III.

## I.      ALLEGED FACTUAL BACKGROUND

For the purposes of ruling on the motion to dismiss, the Court is required to accept as true the following allegations set forth in the first amended complaint.

### A.   Hartman Manages the Child and Adolescent Psychiatric Unit

From July 2014 to June 2019, Centra Health, Inc. ("Centra") employed Hartman, a licensed registered nurse, as the unit manager of Virginia Baptist Hospital's ("VBH") Child and Adolescent Psychiatric Unit ("CAPU"). Dkt. 17 ¶¶ 13, 17. Centra owns and operates VBH. *Id.* ¶ 10.

VBH's CAPU is one of three secure psychiatric units in Virginia that admit children under the age of ten, and it is licensed by the Virginia Department of Behavioral Health and Developmental Services. *Id.* ¶¶ 24–25. The CAPU accepts transfers of child and adolescent patients from other hospitals subject to the admission, stay, and exclusion criteria provided in its Scope of Services. *Id.* ¶¶ 26–27; *see* Dkt. 17-1 (CAPU's Scope of Services). Centra's intake office applies these criteria in determining whether to accept or deny transfer requests. Dkt. 17 ¶ 28. At the same time, the Emergency Medical Treatment and Labor Act ("EMTALA"),[1] requires participating hospitals with "specialized capabilities or facilities" to accept "an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual." 42 U.S.C. § 1395dd(g); *see* Dkt. 17 ¶ 128.

As the CAPU manager, Hartman supervised the CAPU's staff and monitored the unit's daily patient census. *Id.* ¶¶ 19, 29. Stephanie East, Centra's Vice President of Behavioral Health, supervised Hartman. *Id.* During her employment with Centra, Hartman received mostly positive

---

[1] EMTALA applies to VBH because the hospital participates in Medicare or Medicaid. *See* Dkt. 17 ¶¶ 128, 130.

performance reviews and was nominated for—and received—various statewide nursing awards. *Id.* ¶¶ 20–21.

**B. Centra's Intake Department Denies Two Transfer Requests to the CAPU**

On June 1, 2019, Hartman noticed that the CAPU's patient census was lower than normal. *Id.* ¶ 30. After reviewing the previous day's transfer requests, Hartman discovered that the intake department denied two requests to transfer children experiencing acute psychiatric symptoms to the CAPU from hospital emergency rooms in other parts of Virginia. *Id.* ¶¶ 31–32. Upon further investigation, Hartman learned that Centra's intake department—at the direction of Dr. Jitendra Annapareddy, a psychiatrist and the only juvenile autism specialist in Lynchburg—had denied the transfer requests because the children had autism and lived outside the Lynchburg area, a set of circumstances that made post-discharge care arrangements difficult. *Id.* ¶¶ 33–36, 95. According to the CAPU's Scope of Services, "[a]lthough having an autism spectrum disorder is not [an] exclusionary criteri[on], the [CAPU's] ability to care for a child with [autism spectrum disorder] will be based on [the child's] level of functioning." *Id.* ¶ 35; *see also* Dkt. 17-1 at 3. Thus, the intake department denied the transfer requests for reasons outside of the established exclusionary criteria and even though beds were available, in violation of EMTALA. Dkt. 17 ¶¶ 35–37. Hartman took steps to determine the status of the children whose transfer requests had been denied, and although one child had already been transferred to a different hospital, she arranged for the intake department to admit the other child to the CAPU for stabilization. *Id.* ¶¶ 38–41.

The next day, Hartman reported the denial of the two transfer requests to her superiors. *Id.* ¶ 42. In an email to Dr. Michael Judd, Centra's Medical Director of Psychiatric Services, Sylvia Gallagher, Centra's Director of Psychiatric Emergency Services, and East, Hartman wrote, "We cannot de[n]y kids with autism based on being out of the area. This is a[n] injustice to the children

and frankly an EMTALA violation. We could face two [$]50,000 fines over this." Dkt. 17-2 at 2; *see also* Dkt. 17 ¶ 42. In text messages that same day, East warned Hartman to "[b]e careful about admitting 'fault'" in communications with the emergency rooms that had requested the transfers, noting that the hospital "could be opening up a larger can of worms and indicting" itself. *Id.* ¶ 45; *see also* Dkt. 17-3 at 2.

### C.  Hartman Organizes Meetings Regarding Transfer Request Denials

On June 5, Hartman organized a meeting with East and other staff members to address and correct the problems that led to the transfer request denials. *Id.* ¶¶ 44, 46. At the meeting, Hartman again described the transfer request denials as EMTALA violations. *Id.* ¶ 47.

Immediately after that meeting, East asked Hartman to meet with her and Judd. *Id.* ¶¶ 48–50. During this second meeting, Judd warned Hartman that her email messages referencing the purported EMTALA violations "could get circulated" and were "over the top." *Id.* ¶ 51. East told Hartman that her email was "manic and pressured." *Id.* ¶ 54. Hartman stated that she needed to stop the meeting because she would not participate in a cover-up of the EMTALA violations and that she wanted a human resources department representative present. *Id.* ¶ 55. East then directed Hartman to leave the hospital. *Id.* ¶ 56. As she walked to her car, Hartman received a text message from East—intended for the human resources department—asking whether she could take Hartman's keys and badge. *Id.* ¶ 58.

After leaving the hospital that day, Hartman compiled and preserved evidence of the EMTALA violations, including the intake logs documenting the transfer request denials. *Id.* ¶ 63. She also reported the EMTALA violations to the Virginia Department of Health's Office of Licensure and Certification ("OLC"), a state agency responsible for investigating hospitals' compliance with federal laws and regulations. *Id.* ¶¶ 68–69.

### D. Centra Terminates Hartman's Employment

On June 6, the day after her meetings with East, Judd, and other staff members, and only four days after first notifying her supervisors about the purported EMTALA violations, Centra terminated Hartman. *Id.* ¶ 60. In an email, Centra's Human Resources Director, Shannon Meadows, wrote, "At this point, we believe that it is in everyone's best interest to end our working relationship." *Id.* ¶ 61; *see* Dkt. 17-4 at 2. Meadows also wrote that Hartman and "[her] family are always welcome to receive patient services as appropriate from Centra providers," and thanked Hartman "for all [her] concerns regarding potential EMTALA violations." Dkt. 17-4 at 2.

The same day, three armed Centra security officers showed up to Hartman's house and pounded on her front door for more than 30 minutes, demanding that she return "Centra property." Dkt. 17 ¶ 64.

### E. OLC Investigates Hartman's Report of EMTALA Violations

The OLC investigated Hartman's report of EMTALA violations and released its findings in a "Statement of Deficiencies and Plan of Correction" on July 25. *Id.* ¶ 70; *see* Dkt. 17-5. According to the OLC's findings, Centra's staff "denied requests from two transferring hospitals[] for admissions to the [CAPU]" for children "who required specialized behavioral health care services offered by the facility," "failed to provide evidence [that the CAPU] lacked capacity and/or capability to accept the two requests for admission," and "altered" the intake logs that explained the reasons for denying the two transfer requests. Dkt. 17 ¶¶ 71–72; *see* Dkt. 17-5 at 3. The OLC further found that a Centra intake specialist made the alterations "on or about the time" Hartman reported her concern that the denials violated the EMTALA. Dkt. 17 ¶¶ 71–72; *see* Dkt. 17-5 at 3–4.

### F.  East's Statements About Hartman

On June 10, East emailed Denise Konrad, Director of Strategic Initiatives and Policy at the Virginia Health Care Foundation ("VHCF"), about a scholarship application for further professional nursing education that Hartman had pending with VHCF. Dkt. 17 ¶¶ 76–77. Unsolicited, East informed Konrad that Hartman "is no longer with our organization" and wrote, "Wasn't sure if you needed an update before distributing scholarship funds." *Id.* ¶ 77. At some point in the two weeks after East sent this email to Konrad, East called Konrad to specify that Centra had terminated Hartman's employment "for cause." *Id.* at ¶ 79. Soon after, Konrad called Hartman to discuss what East shared with her. *Id.* ¶ 80. Hartman denied being fired for cause and instead told Konrad that she left for personal reasons. *Id.* On June 27, Konrad emailed East about Hartman's denial; East immediately responded by asking "exactly what [Konrad] conveyed to [Hartman]" and requesting that Konrad not "send [Hartman] any email threads." *Id.* ¶¶ 82–84. Eventually, Hartman's attorney intervened, and Hartman received the scholarship. *Id.* ¶¶ 86–87.

After Hartman's termination, East also told other Centra employees that Hartman was "mentally ill" and "posed a risk of gun violence" to them. *Id.* ¶ 149.

### G.  Centra Alleges Hartman Made Unauthorized Purchases

On June 12, 2019, Meadows sent Hartman another letter, stating that her final paycheck would be docked for damage to a cell phone and for use of a Centra credit card for unapproved expenses. *Id.* ¶¶ 89–91; *see* Dkt. 17-6 at 2. But Hartman's husband returned the cell phone to Centra in working order, and Centra had previously authorized the expenses. Dkt. 17 ¶ 92. Meadows' letter noted that "[Centra's] investigation into other unapproved purchases and [Hartman's] behaviors is ongoing." *Id.* ¶ 91; *see* Dkt. 17-6 at 2.

Centra also reported to law enforcement that Hartman had embezzled from Centra by using her company credit card to make unauthorized purchases for personal use and failing to reimburse Centra. Dkt. 17 ¶ 105. Hartman cooperated with investigators and provided proof that she had used the card in accordance with Centra policy. *Id.* ¶¶ 106–07. Centra later repeated the allegations of embezzlement to the Nursing Board in a complaint against Hartman. *Id.* ¶¶ 109–10.

### H. A Centra Doctor Refuses to Refill Hartman's Daughter's Medication

Annapareddy had provided medical care for Hartman's daughter, A.H., for years. *Id.* ¶¶ 33–34, 94–95. A.H. has juvenile autism, and suffers serious side effects when she does not take the psychotropic medication Annapareddy prescribed her. *Id.* ¶¶ 16, 96. In August 2019, Annapareddy refused to authorize refills of A.H.'s prescription for the medication. *Id.* ¶¶ 97–98.

### I. Centra Bans Hartman From Centra Property

On November 16, 2019, Hartman, her husband, and their daughter A.H. transported Hartman's mother-in-law to Centra-operated Lynchburg General Hospital's emergency room— the only emergency room in Lynchburg—for treatment during a medical emergency. *Id.* ¶¶ 112–14. Wesley Gillespie, a Centra employee, threatened and insulted Hartman, her family, and her attorney, who had met them at the hospital. *Id.* ¶¶ 115–17. Gillespie summoned a Lynchburg police officer and attempted to enlist his aid in intimidating Hartman and her family. *Id.* ¶ 119. After speaking with Hartman, the police officer declined to intervene. *Id.*

On December 31, Nathan Campbell, Centra's Director of Security, sent Hartman a letter informing her that she was banned from Centra property except in emergency medical situations. *Id.* ¶¶ 12, 120; *see* Dkt. 17-7 at 2. The letter explained that Centra was banning Hartman because she "demonstrated aggressive and threatening behavior towards various staff members which has

7

impeded patient care." Dkt. 17 ¶ 122; *see* Dkt. 17-7 at 2. Campbell sent a copy of the letter to the Lynchburg Police Department. *Id.* ¶ 121.

## II.    LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*. at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). And the court cannot "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### III.   ANALYSIS

#### A.  EMTALA Whistleblower Retaliation Claim

To counteract hospitals' practice of patient dumping, or turning away acutely ill patients who are unable to pay for emergency medical treatment, EMTALA requires hospitals to screen and stabilize patients with emergency medical conditions before transferring them. *Williams v. Dimensions Health Corp.*, 952 F.3d 531, 534 (4th Cir. 2020). A hospital with an "emergency department" must "provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists" when someone "comes to the emergency department" and requests treatment. 42 U.S.C. § 1395dd(a). If the hospital determines through the screening process that the person has an "emergency medical condition," the hospital must either "stabilize the medical condition," or "transfer [] the individual to another medical facility in accordance with subsection (c)." *Id.* § 1395dd(b)(1)(A)–(B).

EMTALA also protects certain whistleblowers. "A participating hospital may not penalize or take adverse action . . . against any hospital employee because the employee reports a violation of a requirement of this section." 42 U.S.C. § 1395dd(i). Centra contests only that Hartman "report[ed] a violation of a requirement" of EMTALA. Dkt. 27 at 6–14; Dkt. 30 at 5–10.

The Tenth Circuit has held that this part of the provision "generally permits suit only when the plaintiff . . . reported an *existing* EMTALA violation, not an *impending* one." *Genova v. Banner Health*, 734 F.3d 1095, 1099 (10th Cir. 2013) (quotation marks and citation omitted) (emphasis in original). In *Genova*, a hospital fired an emergency room doctor who complained to his supervisors that the emergency department was overcrowded. *Id.* at 1096. The plaintiff then sued the hospital under EMTALA's whistleblower protection provision. *Id.* at 1096. After noting that overcrowding is a sign of patient hoarding rather than patient dumping, the Tenth Circuit held that the doctor had

9

not reported an EMTALA violation because "[h]is complaint wasn't about an EMTALA violation but more nearly its inverse." *Id.* at 1098.

But unlike the doctor in *Genova*, who reported emergency department overcrowding—a problem that EMTALA does not address—Hartman alleges that she reported refusals to accept appropriate transfers to a hospital with specialized capabilities or facilities, a problem that EMTALA explicitly addresses in its nondiscrimination provision. Under that provision, "[a] participating hospital that has specialized capabilities or facilities (such as burn units, shock-trauma units, [or] neonatal intensive care units . . . ) shall not refuse to accept an appropriate transfer of an individual who requires such specialized capabilities or facilities if the hospital has the capacity to treat the individual." 42 U.S.C. § 1395dd(g). This requirement applies "to any participating hospital with specialized capabilities, regardless of whether the hospital has a dedicated emergency department." 42 C.F.R. § 489.24(f)(1). Centra concedes that "the CAPU at [VBH] offers the specialized services contemplated by 42 C.F.R. § 489.24(f)" and "[a]s such, in the case of an appropriate transfer, it is generally correct that Centra may not refuse to accept a transfer from a transferring hospital." Dkt. 30 at 10.

But Centra argues that it had no obligation to accept the requested transfers because they were not "appropriate" transfers as defined in subsection (c). Dkt. 30 at 7. Centra contends that the transfers were not "appropriate" transfers because they did not satisfy the second part of that definition: "the receiving facility," Centra, did not "agree[] to accept transfer of the individual[s] and to provide appropriate medical treatment." *See* Dkt. 30 at 10; 42 U.S.C. § 1395dd(c)(2)(B)(ii).

A transfer is "appropriate" under subsection (c) if "the receiving facility (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment." 42 U.S.C.

§§ 1395dd(c)(2)(B)(i)–(ii). Of course, Hartman alleges that Centra denied the transfer requests. Dkt. 17 ¶¶ 33–36.

Centra's argument fails. First, even though the nondiscrimination provision in subsection (g) uses the term "appropriate" to describe the transfers that a receiving hospital must accept, that provision does not explicitly reference the definition of an "appropriate" transfer under subsection (c). In contrast, subsection (b), which describes what a hospital must do when it determines that a person has an "emergency medical condition," explicitly references subsection (c) in requiring a hospital to either "stabilize the medical condition," or "transfer [] the individual to another medical facility *in accordance with subsection (c)*." 42 U.S.C. § 1395dd(b)(1)(A)–(B) (emphasis added). If Congress intended the nondiscrimination provision in subsection (g) to incorporate the definition of an "appropriate" transfer under subsection (c), it could have explicitly referenced subsection (c), as it did in subsection (b). *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). Because Congress did not explicitly reference subsection (c) in the nondiscrimination provision, the Court cannot conclude that Congress intended the nondiscrimination provision to incorporate subsection (c)'s definition of an "appropriate" transfer.

More importantly, understanding subsection (c)'s requirement that a hospital must "agree to accept [the] transfer of the individual and to provide appropriate medical treatment" as a prerequisite for an "appropriate transfer" under subsection (g) would render the nondiscrimination provision meaningless. A receiving hospital with specialized capabilities "*shall not refuse to accept* an appropriate transfer of an individual who requires" those capabilities unless they lack capacity. 42 U.S.C. § 1395dd(g) (emphasis added). But if the second requirement from subsection (c) applies, a receiving hospital could be relieved from the obligation to accept such a transfer by

*refusing to "agree[] to accept* transfer of the individual . . . ." 42 U.S.C. § 1395dd(c)(2)(B)(ii) (emphasis added). This contradictory and illogical result cannot be what Congress intended. So while there is a "presumption that identical words used in different parts of the same act are intended to have the same meaning," the presumption "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 108 (2012) (finding the "presumption overcome because several provisions of the Act would make no sense" if the word "award" had the same meaning across all provisions). Because the nondiscrimination provision would "make no sense," *id.*, if an "appropriate transfer" under subsection (g) is the same as an "appropriate" transfer under subsection (c), the Court finds that this presumption is overcome here. Indeed, the Tenth Circuit has similarly rejected the argument Centra makes. *St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs.*, 309 F.3d 680, 699 (10th Cir. 2002) (noting that the hospital's suggestion "that it cannot be held liable for violating § 1395dd(g) unless each of § 1395dd(c)(2)'s requirements was satisfied . . . would lead to an absurd result, as the requirement that the hospital must accept a transfer under § 1395dd(g) would be nullified by the hospital's refusal to accept").

Even if the definition of an "appropriate" transfer under subsection (c) otherwise applies to the term "appropriate transfer" in the nondiscrimination provision under subsection (g), the Court finds that Hartman's allegations support an inference that the transfers were "appropriate." Hartman alleges that, at the time the transfer requests were made, the CAPU had beds available and specialized capabilities that these children suffering from psychiatric crises required. Dkt. 17 ¶¶ 26–27, 31–34, 95. Because the CAPU "ha[d] available space and qualified personnel for the treatment of the individual[s]," 42 U.S.C. § 1395dd(c)(2)(B)(i), the transfers were "appropriate"

even under subsection (c). Either way, EMTALA's nondiscrimination provision required the CAPU to accept the transfers.

The Court finds that Hartman's factual allegations are sufficient to state a plausible whistleblower retaliation claim under EMTALA. Hartman alleges that Centra violated EMTALA's nondiscrimination provision when its intake department denied two transfer requests from other hospitals' emergency departments to the CAPU for children in need of immediate emergency psychiatric care and stabilization. Dkt. 17 ¶¶ 32, 42, 128, 131, 142. She also alleges that, at the time the transfer requests were made, the CAPU had beds available and specialized capabilities—including medical personnel, such as Annapareddy, the only juvenile autism specialist in Lynchburg—needed to treat these children suffering from psychiatric crises. *Id.* ¶¶ 26–27, 31–34, 95. The intake department's justification for denying the transfers—that the children had autism and were located outside Lynchburg—did not comply with the CAPU's Scope of Services. *Id.* ¶¶ 26, 35; *see also* Dkt. 17-1. Nor did the justification comply with EMTALA's directive that participating hospitals with specialized capabilities "shall not refuse to accept an appropriate transfer of an individual who requires" those capabilities "if the hospital has the capacity to treat the individual," 42 U.S.C. § 1395dd(g). Taken as true, Hartman's allegations support a reasonable inference that Centra refused to accept appropriate transfers of two individuals who required the CAPU's specialized capabilities or facilities, even though the CAPU had the capacity to treat those individuals. In addition, Hartman alleges that Centra terminated her four days after she first reported the EMTALA violations to her supervisors, Judd and East, by email, and just one day after those supervisors ordered her to leave the hospital following a meeting she organized to discuss the violations. Dkt. 17 ¶¶ 42–62, 131–36, 142.

The Court concludes that Hartman alleges sufficient facts to show that she reported EMTALA violations and that Centra penalized or took adverse action against her for reporting those violations. Thus, Hartman has stated a plausible EMTALA whistleblower claim and the Court will deny Centra's motion to dismiss Count I.[2]

### B.  Virginia Wrongful Termination (*Bowman*) Claim

Virginia recognizes a narrow exception to the at-will employment doctrine that permits certain claims for wrongful termination of employment in violation of public policy. *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985). An employee can establish a *Bowman* claim "[w]hen the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." *Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 796 S.E.2d 188, 190–91 (Va. 2017) (quotation marks and citation omitted). An employee must base her *Bowman* claim on a Virginia state statute, not a federal one. *See Lawrence Chrysler*

---

[2] Centra also argues that EMTALA is triggered only when an individual "comes to the emergency department" of a hospital, and that the CAPU is exempt because it is an inpatient psychiatric unit, not an emergency department. Dkt. 27 at 10; *see* 42 U.S.C. § 1395dd(a). However, subsection (a) of EMTALA does not apply to VBH, as it does not have an emergency department. Dkt. 28 at 4. Further, Hartman does not argue that she reported a violation of subsection (a); instead, she argues that she reported a violation of subsection (g), EMTALA's nondiscrimination provision. *Id.*; *see also* Dkt. 17 ¶ 128.

Additionally, Centra argues that admitting an individual as an inpatient ends a hospital's obligations under EMTALA, and the CAPU is an inpatient unit. 42 C.F.R. § 489.24(a)(1)(ii). In support of this argument, Centra cites *Baber v. Hospital Corp. of America*, in which the Fourth Circuit found that a hospital that had accepted the transfer of an individual to its inpatient psychiatric ward was not liable under EMTALA for failure to screen and stabilize the patient. 977 F.2d 872, 884 (4th Cir. 1992). Again, the regulation that Centra cites applies only "in the case of a hospital that has an emergency department," which VBH does not have. *See* 42 C.F.R. § 489.24(a). Finally, *Baber*'s conclusion—that a hospital that *accepts* the transfer of an individual to its inpatient psychiatric ward is not subject to the *screening* requirement laid out in subsection (a) of EMTALA—does not apply here, since Hartman alleges not a violation of subsection (a), but rather a violation of subsection (g), involving the *denial* of such a transfer.

*Plymouth Corp. v. Brooks*, 465 S.E.2d 806, 809 (Va. 1996) (finding no *Bowman* claim where employee failed to identify a Virginia statute that the employer violated in terminating him); *see also Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 450–51 (E.D. Va. 2002) ("[A] claim under *Bowman* must find root in a *state* statute; it cannot have its genesis in an act of Congress.") (quotation marks and citation omitted).

Hartman alleges that Centra violated the public policy expressed in Virginia Code § 32.1-125.4, which reads:

> No hospital may retaliate or discriminate in any manner against any person who (i) in good faith complains or provides information to, or otherwise cooperates with, the Department or any other agency of government or any person or entity operating under contract with an agency of government having responsibility for protecting the rights of patients of hospitals, or (ii) attempts to assert any right protected by state or federal law.

Specifically, relying on subsection (ii),[3] Hartman argues that her reports to East and Judd about EMTALA violations were attempts to assert a right protected by federal law—her right "to blow the whistle on Centra's EMTALA violation[s]." Dkt. 28 at 17; *see* 42 U.S.C. § 1395dd(i). Indeed, Hartman's reports about the EMTALA violations to her supervisors fall within the purpose

---

[3] Hartman does not purport to state a claim under subsection (i), even though she alleges that she reported the EMTALA violation to OLC investigators on June 5—one day before Centra terminated her employment. Dkt. 17 ¶¶ 68–69. Although OLC is a state agency, Hartman does not allege sufficient facts to make the inference that Centra knew about her report to OLC investigators before it terminated her employment. Further, it is not enough that Hartman reported the EMTALA violations to hospital administrators Judd and East. *Id.* ¶ 42. Only hospital employees who report violations to *government agencies or contractors* responsible for protecting the rights of patients of hospitals receive the statute's protections. *See Hamnik v. Sentara Med. Grp.*, No. 2:11-CV-454, 2011 WL 6960611, at *3 (E.D. Va. Nov. 10, 2011), *report and recommendation adopted*, No. 2:11-CV-454, 2012 WL 32443 (E.D. Va. Jan. 5, 2012) ("[T]he statute's purpose is plainly to protect hospital employees who complain to *third parties* (i.e. regulators) responsible for protecting the rights of patients of hospitals.") (emphasis in original). Because Hartman failed to allege sufficient facts to support a reasonable inference that Centra knew that she reported the violations to OLC investigators, she fails to state a *Bowman* claim based on a violation of Virginia Code § 32.1-125.4(i).

of Virginia Code § 32.1-125.4(ii)—to protect hospital employees who exercise rights protected by

state or federal law. And as a hospital employee who exercised her right to report a violation of

federal law, Hartman is a member of the statute's class of protected persons. *See also* Dkt. 17 ¶¶

168–69.

But Centra argues that Virginia Code § 32.1-125.4(ii) does not apply to the CAPU. Dkt. 27

at 19; Dkt. 30 at 16. Virginia Code § 32.1-124 exempts, among other entities, "(ii) an institution

licensed by the [Virginia] Department of Behavioral Health and Developmental Services"[4] from

several provisions, including § 32.1-125.4. Indeed, Hartman alleges that "Centra's secure

psychiatric units are licensed by the Virginia Department of Behavioral Health and Developmental

Services." Dkt. 17 ¶ 25. Hartman argues that the CAPU is not an "institution" but rather part of a

"hospital." Dkt. 28 at 17–18.

The Court finds Hartman's argument more persuasive. The text of § 32.1-125.4 applies to

hospitals. *See* § 32.1-125.4 ("No *hospital* may retaliate or discriminate . . . .") (emphasis added).

For purposes of this section, a "hospital" is

> any facility licensed pursuant to this article in which the primary function is the
> provision of diagnosis, of treatment, and of medical and nursing services, surgical
> or nonsurgical, for two or more nonrelated individuals, including hospitals known
> by varying nomenclature or designation such as children's hospitals, sanatoriums,
> sanitariums and general, acute, rehabilitation, chronic disease, short-term, long-
> term, outpatient surgical, and inpatient or outpatient maternity hospitals.

Va. Code § 32.1-123. Hartman alleges that VBH is a hospital. Dkt. 17 ¶¶ 68–69, 130 (noting that

the Virginia Department of Health's OLC investigates legal compliance of hospitals that

participate in Medicare or Medicaid, including VBH). She also alleges that the CAPU is a unit of

VBH. *Id.* ¶¶ 22–23. In addition to exempting institutions licensed by the Department of Behavioral

---

[4] Chapter 5, Article 1 of Title 32.1, under which these Code sections fall, does not define "institution." *See* Va. Code § 32.1-123.

Health and Developmental Services, § 32.1-124 explicitly exempts only specific types of hospitals—those "owned or operated by an agency of the United States government" and some of those "owned or operated by an agency of the Commonwealth." *See* §§ 32.1-124(iv) and (vi). Hartman alleges that Centra—a corporation, not an agency of the Commonwealth or the United States—owns and operates VBH. Dkt. 17 ¶ 10. Because no exemption in § 32.1-124 covers VBH, § 32.1-125.4 applies to VBH. Centra provides no support for its contention that the CAPU—despite being part of VBH—is an exempt "institution" under § 32.1-124 merely because it is licensed by the Virginia Department of Behavioral Health and Developmental Services. Based on Hartman's allegations, the Court cannot conclude that the CAPU is a "institution" exempt from the provision in § 32.1-125.4.

Hartman has alleged sufficient facts, taken as true, to support reasonable inferences that (1) Centra violated the public policy explicitly expressed in Virginia Code § 32.1-125.4 by terminating Hartman's employment in retaliation for attempting to assert her right to report EMTALA violations at VBH to her supervisors and (2) Hartman, as a VBH employee, was a member of that class of persons directly entitled to the protection enunciated by the public policy. Accordingly, the Court finds that she has stated a plausible *Bowman* claim and will deny the motion to dismiss Count IV.

### C.  Defamation Claims

To state a defamation claim under Virginia law, a plaintiff must allege facts showing that a defendant (1) published (2) a false (3) factual statement (4) that concerns and harms the plaintiff or her reputation, (5) while knowing that the statement was false or while unreasonably believing that the statement was true. *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009) (citations omitted). "Defamatory words that cause prejudice to a person in her profession are

actionable as defamation per se," meaning that the Court presumes harm to the plaintiff's reputation. *Id.* (citations omitted).

Hartman raises two defamation claims: one against Centra and East based on East's statement to VHCF and East's statements to other Centra employees (Count II), and one against Centra and Campbell based on Campbell's statement to the Lynchburg Police Department (Count III).

### 1. East's Report to VHCF

Hartman alleges that East made a false report to VHCF that she was fired "for cause," which prejudiced Hartman in her profession. Dkt. 17 ¶ 146 (internal quotation marks omitted). Hartman also alleges that East knew that her termination was "unlawful[] and without cause because Hartman reported EMTALA violations." *Id.* ¶ 147. Centra and East argue that East's report to VHCF is not actionable for two reasons. First, they contend East's statement that Centra terminated Hartman's employment "for cause" is true based on the facts alleged in the first amended complaint. Dkt. 27 at 15. Second, East and Centra contend that Hartman's claim must fail because she did not plead the "exact words" that are alleged to be defamatory. Dkt. 27 at 15.

Under Virginia law, truth is not "an affirmative defense to be established by the defendant. Instead, the plaintiff must prove falsity." *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725 (Va. 1985). To survive a motion to dismiss, then, Hartman must allege sufficient facts that, if proven true, show that East's statement that Hartman was fired "for cause" was false. Black's Law Dictionary defines "for cause" as "for a legal reason or ground," and describes the phrase as "express[ing] a common standard governing the removal of . . . an employee under contract." *For Cause*, Black's Law Dictionary, 11th ed. 2019. Hartman alleges that Centra fired her for reporting EMTALA violations to her supervisors. Dkt. 17 ¶¶ 42, 61–62. Terminating a hospital employee for reporting

EMTALA violations itself violates federal law. *See* 42 U.S.C. § 1395dd(i). Because Hartman's factual allegations support a reasonable inference that she was not fired "for a legal reason or ground," Hartman has met her burden to allege that East's statement that she was terminated "for cause" is false.

Although Virginia law requires a complaint alleging a defamation claim to set out the "exact words spoken or written," *Fed. Land Bank of Baltimore v. Birchfield*, 3 S.E.2d 405, 410 (Va. 1939), Federal Rule of Civil Procedure 8 provides the law governing pleading requirements in federal court. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965). Because Rule 8 "does not contain a special pleading requirement for defamation," *Wuchenich v. Shenandoah Mem'l Hosp.*, No. 99-1273, 2000 WL 665633, at *14 (4th Cir. May 22, 2000) (per curiam), Hartman need only offer "a short and plain statement showing that [she] is entitled to relief." *Id.* Hartman alleges that East told Konrad that she was fired "for cause," which jeopardized her pending scholarship to fund further professional nursing education. Dkt. 17 ¶¶ 15, 80, 86. After Hartman's attorney intervened, at significant expense to Hartman, VHCF ultimately awarded Hartman the scholarship. *Id.* In sum, Hartman alleges facts that, taken as true, establish the elements of a defamation claim. Therefore, she has stated a plausible claim for relief based on East's statement to VHCF.[5]

---

[5] Centra and East briefly raise two other arguments. Both fail. First, they contend that Hartman authorized East to communicate with VHCF about Hartman's employment status. Dkt. 27 at 15. But such authorization has no bearing on whether East's statement about Hartman's termination "for cause" can form the basis of a defamation claim. Centra and East also argue that Hartman's statement to Konrad that she left VBH for personal reasons undermines her defamation claim. *Id.* at 4. Although Hartman's statement might alter the extent of the harm that she may ultimately be able to prove, she still suffered because of East's statement. Moreover, Hartman's statement is irrelevant to establishing the falsity of East's statement.

### 2.  East's Statements to Centra Employees

Hartman alleges that East told other Centra employees that Hartman was "mentally ill" and "posed a risk of gun violence" to them. *Id.* ¶ 149. Hartman also alleges that East "acted with actual malice" in doing so. *Id.* ¶ 151. Centra and East argue that East's comments to other Centra employees are not actionable because they are protected by a qualified privilege.

Under Virginia law, a qualified privilege attaches to "[c]ommunications between persons on a subject in which the persons have an interest or duty." *Larimore v. Blaylock*, 528 S.E.2d 119, 121 (Va. 2000). The Virginia Supreme Court has "applied the doctrine of qualified privilege in a number of cases involving defamatory statements made between co-employees and employers in the course of employee disciplinary or discharge matters." *Id.* (collecting cases). "Whether a communication is privileged is a question of law." *Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013).

However, on "a motion to dismiss filed under Federal Rule of Procedure 12(b)(6)," a court "generally cannot reach the merits of an affirmative defense" such as the existence of a qualified privilege unless "all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (quotation marks and citations omitted) (emphasis omitted).

Because Hartman alleges that East made these statements to Centra employees following her termination, East's statements may be protected by this qualified privilege. But at this stage, the Court cannot conclude that these statements were made "in the course of employee disciplinary or discharge matters" and whether the employees had "an interest or duty" related to the statements. *Larimore*, 528 S.E.2d at 121. Although Centra argues that East's statements related to "safety at Centra," Dkt. 27 at 17, without more information about the context in which these

20

statements were made, the Court cannot find that Hartman's first amended complaint or Centra's briefing sufficiently establishes that the statements are covered by the qualified privilege.[6]

The Court finds that Hartman states a plausible claim for defamation against Centra and East based on East's statement to Konrad that Hartman was fired "for cause" and East's statements to Centra employees that Hartman was "mentally ill" and "posed a risk of gun violence." Accordingly, it will deny the motion to dismiss Count II.

### 3.   Campbell's Letter to the Lynchburg Police Department

Hartman alleges that Campbell sent the Lynchburg Police Department a letter that prejudiced Hartman in her profession. The letter "falsely stat[ed]" that Hartman had shown "aggressive and threatening behavior toward various staff members which has impeded patient care." *Id.* ¶¶ 122, 159. Centra and Campbell argue that Campbell's letter to the Lynchburg Police Department is not actionable because Campbell's statement is an expression of opinion, not a factual assertion. Dkt. 27 at 17–18. The Court agrees with Centra and Campbell and finds that Campbell's statement is an expression of opinion that cannot form the basis of a defamation claim.

Only factual statements—those that "are capable of being proved true or false"—can form the basis of a cause of action for defamation. *Raytheon Tech. Servs. Co. v. Hyland*, 641 S.E.2d 84, 91 (Va. 2007). In contrast, statements that cannot be shown to be false are "pure expressions of

---

[6] Centra also argues that East's statements to Centra employees cannot form the basis of a defamation claim because they were not published to third parties. Dkt. 27 at 16–17; Dkt. 30 at 12–13. But this argument merely repackages Centra's contention that the statements are protected by the qualified privilege already discussed. *See Montgomery Ward & Co. v. Nance*, 182 S.E. 264, 270 (holding that a store manager went "beyond the scope of the privilege" and also "publi[shed] . . . the words" he said about the termination of another employee when the manager asked a payroll clerk with "no interest whatever in hearing the communication, nor any duty to perform with reference thereto," to listen to the conversation). At this juncture, because the Court cannot determine whether the statements were protected by the qualified privilege, the Court necessarily finds that Hartman has sufficiently alleged publication of the statements.

opinion" and cannot form the basis of a defamation claim. *Id.* at 90. Unlike statements of fact, which can be verified by objective evidence, expressions of opinion are "relative in nature and depend largely upon the speaker's viewpoint." *Id.* (quotation marks and citation omitted). When statements use facts to "support or justify an opinion," however, they may form the basis of a defamation claim. *Id.* at 90.

In *Raytheon*, the Supreme Court of Virginia found that the statement "Cynthia is frequently verbose and vocal in her opinions, to a degree that others stop participating in open dialogue" was an expression of opinion. *Id.* at 92. The court noted that the defamatory aspect of the statement was that the plaintiff's negative conduct led to a specific result. *Id.* Although the result—whether "others stop[ped] participating in open dialogue"—was capable of being proved true or false, the court stated that "[w]hether the result in fact occurred [was] only relevant if [the plaintiff's] negative conduct was its cause." *Id.* But whether the plaintiff engaged in negative conduct—being "verbose and vocal"—reflected the speaker's perspective and was "a matter of opinion not subject to proof." *Id.* Thus, the statement could not form the basis of a defamation claim.

Analogizing the Campbell's statement to the one in *Raytheon*, the Court concludes that Campbell's statement cannot form the basis of a defamation claim. His commentary on Hartman's behavior was an expression of opinion. *See id.* Although the result—whether Hartman "impeded patient care"—is capable of being proved true or false, whether patient care was in fact hindered matters only if Hartman's "aggressive and threatening behavior" hindered it. *See id.* But whether Hartman engaged in "aggressive and threatening behavior" implicates the speaker's perspective, just like the plaintiff's "verbose and vocal" conduct in *Raytheon*. *See id.* Because Campbell's statement that Hartman "impeded patient care" is "a matter of opinion not subject to proof," *id.*, this statement cannot form the basis of a defamation claim.

The Court finds that Hartman fails to state a plausible defamation claim against Centra and Campbell based on Campbell's statement in the letter to the Lynchburg Police Department. Accordingly, the Court will grant the motion to dismiss Count III.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that Hartman alleges sufficient facts that, taken as true, state plausible claims for relief with respect to Counts I, II, and IV. However, the Court finds that Hartman fails to state a plausible defamation claim under Count III. Accordingly, the Court will deny Centra, East, and Campbell's motion to dismiss with respect to Count I, II, and IV, but will grant the motion with respect to Count III.

An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 23rd day of July, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE