CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/8/2021

JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
        DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

| | | |
|---|---|---|
| **KIMBERLY HARTMAN,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **CASE NO. 6:20CV00027** |
| | : | |
| **CENTRA HEALTH, INC.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **and** | : | |
| | : | |
| **STEPHANIE EAST,** | : | |
| *Defendants*. | : | |

## SECOND AMENDED COMPLAINT[1]

**1.**      This action is brought by Plaintiff Kimberly Hartman ("Ms. Hartman") to recover

damages arising from (i) unlawful retaliation by defendant Centra Health, Inc. ("Centra") against

Ms. Hartman for her report of violations by Centra of the Emergency Medical Treatment &

Labor Act ("EMTALA") (42 U.S.C. 1395dd(i)), (ii) defamation by defendants Centra Health,

Inc. and Stephanie East, (iii) recovery of unlawfully withheld salary or wages in violation of

Virginia law and  (iv) unlawful termination of employment by Centra in violation of Virginia's

statutory and common law.

**2.**      The EMTALA is a federal law that prohibits "patient dumping" by hospitals, like those

owned and operated by Centra, that participate in the Medicare and Medicaid programs.

Participating hospitals are not permitted to refuse the transfer admission of emergency patients

---

1   This Second Amended Complaint drops Nathan Campell and the Third Cause of Action from the First Amended
    Complaint in conformity with the Court's dismissal of that cause of action and replaces the Third Cause of
    Action from the First Amended Complaint with a claim pursuant to Code of Virginia § 40.1-29 seeking recovery
    of unlawfully withheld salary of wages, prejudgment interest, liquidated damages and reasonable attorney's fees
    and costs.  The remaining causes of action have been edited to remove redundant matter and to add additional
    facts that have been discovered, but are otherwise substantially unchanged from the First Amended Complaint.

who need specialized services if those patients meet the hospital's admission criteria.  Hospitals

that violate the EMTALA face huge liabilities, including civil liability to affected patients and

astronomical administrative penalties.

**3.**　　　This action results from an insidious and dangerous abuse of power by defendant Centra

Health, Inc. and certain of its executives.  Centra employees, in blatant violation of the

EMTALA, denied or delayed hospital admission to at least two young children who were in

desperate need of emergency psychiatric stabilization.  The children were suffering from acute

psychiatric emergencies at emergency rooms in other hospitals and were referred for emergency

admission to the Child and Adolescent Psychiatric Unit at Virginia Baptist Hospital.  Ms.

Hartman, then the manager of that unit, discovered that other Centra employees had refused

admission to these children and so she stood up to this illegal misconduct by reporting the

violation to her superiors.

**4.**　　　Instead of joining her cause and caring for these children, as both their legal and

professional duties plainly required them to do, Centra, acting by and through its executives.

maliciously and viciously retaliated against Ms. Hartman by (i) threatening her in an attempt to

silence her, (ii) terminating her employment when she would not be silenced, (iii) sending armed

guards to her home to pound on her door and to harass her into returning the evidence of

misconduct they knew she had in her possession, (iv) lying about the circumstances of her

termination from employment to scholastic officials in order to deliberately interfere with her

education and future business interests, (v) falsely attempting to bring criminal charges against

her that they knew were unfounded, (vi) attempting to have her nursing license suspended or

revoked by reporting half-truths and lies of omission to the nursing board, (vii) terminating

medical services to her autistic daughter without cause and (viii) banning her and her attorney from the hospital without cause and on the basis of lies.

5.      In the interest of protecting her patients and the public, Ms. Hartman filed complaints about this egregious and illegal misconduct with several regulatory authorities.  These authorities initiated investigations into Centra's misconduct.  A Centra employee was caught red-handed by one of the investigators when she presented the investigator with falsified and doctored log entries regarding the denial of admission to the juvenile patients.  Ms. Hartman's complaints were verified in their entirety and Centra was found to have violated multiple conditions of its participation in the Medicare and Medicaid programs.  Ms. Hartman seeks to recover the losses and damages she suffered as a result of unlawful retaliation and termination of her employment. She also seeks punitive damages to deter future misconduct.

## <u>JURISDICTION AND VENUE</u>

6.      This Court has subject matter jurisdiction over the federal EMTALA claim pursuant to 42 U.S.C. § 1395dd(d)(2)(A)-(B) and 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over Ms. Hartman's state wrongful termination and defamation claims pursuant to 28 U.S.C. § 1367(a).

8.       Venue is proper in this Court because the acts alleged in the Complaint occurred in the Western District of Virginia.

## <u>PARTIES</u>

9.      Plaintiff **Kimberly Hartman** is a citizen of Virginia who resides in Lynchburg.  She is a licensed registered nurse who was formerly employed by defendant Centra Health, Inc.

10.     Defendant **Centra Health, Inc**. is a Virginia non-stock corporation in the business of

owning and operating hospitals and other medical businesses, practices and facilities in the

Commonwealth of Virginia.  Centra owns and operates Lynchburg General Hospital ("LGH")

and Virginia Baptist Hospital ("VBH"), both located in Lynchburg, Virginia.

**11.**      Defendant **Stephanie East** was, on June 6, 2019, the Vice President of Mental Health at

Centra Health, Inc.

## FACTS

### I.      MS. HARTMAN'S BACKGROUND

**12.**      Ms. Hartman is a registered nurse in Virginia and has been licensed as such since 2002.

**13.**      Ms. Hartman holds two Bachelors degrees, a Masters degree in nursing administration,

an M.B.A and on June 6, 2019 she was enrolled in the Nurse Practitioner curriculum at

Shenandoah University pursuing a Masters degree there.

**14.**      On June 6, 2019, Ms. Hartman was on track to become a psychiatric nurse practitioner

and had a scholarship application pending with the Virginia Health Care Foundation.

**15.**      Ms. Hartman has a daughter, A. H., who is a juvenile with autism and who was being

treated by Dr. Jitendra Annapareddy before and on June 6, 2019.

**16.**      Ms. Hartman was hired by Centra in 2014, and was promoted to the position of Unit

Manager of the Child and Adolescent Psychiatric Unit at VBH; and she held that position until

June 6, 2019, when her employment was abruptly terminated by Centra after she notified her

superiors of serious EMTALA violations.

**17.**      Ms. Hartman was paid a salary of $89,000 per year in addition to benefits that included

paid time off and health insurance.

**18.**      As Unit Manager, Ms. Hartman was responsible for the supervision of the staff in her unit

and she answered to defendant Stephanie East, Vice President of Behavioral Health,

19.     Ms. Hartman received numerous nominations and awards during employment by Centra, including:

- Virginia Top 40 Leaders Under 40 (won award)
- Virginia Nurse of the Year (nominated)

20.     Ms. Hartman had almost exclusively stellar performance appraisals during her employment at Centra.  Indeed, prior the termination of her employment, Ms. Hartman was counseled only once by Centra – for overstaffing her unit and thereby spending too much of Centra's money on patient care and for spending too much money to supply her unit, there was never any allegation made during her employment that she abused her position for her own benefit in any way.

21.     Ms. Hartman was placed on a Performance Improvement Plan and completed it successfully.

22.     On May 20, 2019, an anonymous report was made that Ms. Hartman was improperly working "split-rate" shifts in her unit (*i.e.*, receiving paid time off as a manager in addition to receiving hourly pay and bonuses for working extra nursing shifts in her unit.)

23.     Centra's Corporate Compliance Officer, Wendy Bishop and Centra's Human Resources Director, Shannon Meadows, investigated the above-described anonymous report and concluded on May 28, 2019 that Ms. Hartman had not violated any policy by working "split-rate" shifts and that she was paid appropriately.

II.     **THE DISCOVERY AND REPORTING OF CENTRA'S EMTALA VIOLATIONS**

24.     Centra is in the business of providing health care services, including mental health

services, to individuals throughout Virginia. In particular, Centra provides mental health services through Virginia Baptist Hospital serving juvenile, adolescent, adult and geriatric patients in three separate secure psychiatric units.

25.    The Child and Adolescent Psychiatric Unit at VBH is one of these three psychiatric units.

26.    The Child and Adolescent Psychiatric Unit is also one of just three secure psychiatric units (and one of only two secure private psychiatric units) in Virginia that admits children under the age of ten.

27.    Centra's secure psychiatric units are licensed by the Virginia Department of Behavioral Health and Developmental Services.

28.    Centra is required by statute (12VAC35-105-580) to develop and to make available for public inspection a written Scope of Services[2] that includes the admission, stay and exclusion criteria for each of its licensed secure psychiatric units.  A copy of this document is attached hereto and incorporated herein as **EXHIBIT A**.

29.    The Child and Adolescent Psychiatric Unit accepts emergency transfer of juvenile patients from other hospitals, subject to the Unit's admission, stay and exclusion criteria.

30.    Centra maintains an Intake office to approve, deny and facilitate transfer admissions to all three of its secure psychiatric units.

31.    One of Ms. Hartman's duties as Unit Manager of the Child and Adolescent Psychiatric Unit was to monitor and control the unit's daily patient census.   Given the dearth of similar facilities in the state, Ms. Hartman wanted to maximize the use of the Child and Adolescent Psychiatric Unit to provide care for the youngest patients.

2    It should be noted that during the investigation of Ms. Hartman's allegations, her counsel repeatedly requested, and was repeatedly refused, the ability to inspect this Scope of Services, despite Centra's statutory duty to make this document available for public inspection.  Counsel was forced to use a Freedom of Information Act request to obtain the document from licensing authorities.

32.     On June 1, 2019, Ms. Hartman found that the patient census in her unit was lower than normal, so she contacted Amelia Perry in the Intake Department to review the transfer requests.

33.     Upon review of the transfer requests from the previous day, Mr. Hartman discovered that emergency room physicians at two other hospitals elsewhere in Virginia had sought to transfer young patients suffering from psychiatric emergencies to the Child and Adolescent Psychiatric Unit for stabilization, but that each of these young patients had been denied admission.

34.     One of these patients (age 8) came from a homeless shelter in Northern Virginia and was found sitting on a train track hoping to be killed.  The other patient (age 7) was dangerously unstable and had not responded to a half a dozen medications.  Each of these children was experiencing a dire psychiatric emergency and needed immediate emergency psychiatric care and stabilization.

35.     Upon further investigation of the denial of admission to these children, Ms. Hartman was informed by Amelia Perry that Jitendra Annapareddy had directed her to refuse admission to any children with autism who lived outside of the Lynchburg area.  Indeed, Ms. Perry reported that Dr. Annapareddy had directed her nearly a year previously to exclude autistic children who lived outside of the Lynchburg area.

36.     Dr. Annapareddy is a psychiatrist who specializes in autism and Amelia Perry told Ms. Hartman that he refused admission to these out-of-area autistic children because he found it too difficult to arrange post-discharge care for these children.

37.     The exclusionary criteria for the Child and Adolescent Psychiatric Unit did not include "[a]utism, out of area."  Indeed, the exclusionary criteria specifically provided that "[a]lthough having an autism spectrum disorder is not exclusionary criteria [sic], the ability to care for a

child will be based on a level of functioning."

38.     Centra's denial of transfer admission to the two juvenile patients was a stark violation of the EMTALA.

39.     Centra admitted, in a Plan of Correction it submitted to the Virginia Department of Health after Ms. Hartman's EMTALA complaint was validated by VDH surveyors, that its denial of transfer admission to these juvenile patients were violations of the EMTALA.  Centra attributed these violations to its "intake staff's confusion regarding the admission/exclusion criteria."

40.     Indeed, Centra has long been aware that transfer admissions to its psychiatric units are subject to EMTALA.  In 2015, after Ms. Hartman suggested giving preference to local admissions to Centra's psychiatric units over out-of-area transfer patients, Stephanie East emailed her disagreement and reminded Ms. Hartman that giving such preferential treatment would violate EMTALA.

41.     Ms. Hartman took immediate measures to provide stabilization and care to the children who were denied transfer admission to her unit.

42.     Ms. Hartman called the intake unit and directed staff in the intake unit to discontinue the EMTALA violations and to admit any emergency patients who met admission criteria as long as beds were available.

43.      Ms. Hartman determined that one of the children had been transferred to VCU, but that the other child was still languishing without proper care in an emergency room in Northern Virginia and had been sitting there without care for two days.

44.     Ms. Hartman consulted with Dr. Eric Steckler and arranged to have the child from Northern Virginia transported to VBH and admitted to her unit for stabilization.

**45.**     Ms. Hartman also took steps to address the EMTALA violation and Centra's policy

deficiencies internally. She reported the EMTALA violation by email on June 2, 2019, to

defendant Stephanie East, Sylvia Gallagher, Director of Psychiatric Emergency Services for

Centra and Dr. Michael Judd, Medical Director of Psychiatric Services.  A copy of the email Ms.

Hartman transmitted is attached hereto and incorporated herein as **EXHIBIT B.**

**46.**     Further, Ms. Hartman communicated with Stephanie East, by text message on June 2,

2019, regarding the EMTALA violations.  A screenshot of the text messages is attached hereto

and incorporated herein as **EXHIBIT C**.

**47.**      Ms. Hartman also arranged a meeting to be held on June 5, 2019 to address and correct

the problems that led to the EMTALA violations.

### III.     CENTRA'S RETALIATION AGAINST MS. HARTMAN

### A.     CENTRA EXECUTIVES SCRAMBLED TO SILENCE MS. HARTMAN AND TO COVER UP THE EMTALA VIOLATIONS

**48.**     It was clear from the very beginning that Stephanie East wanted Ms. Hartman to conceal

the EMTALA violations from scrutiny.  In expression of this desire, Ms. East wrote the following

in her text messages to Ms. Hartman on June 2, 2019:

  ○   "You can have them call and follow up and see if they have found a bed and, if not, to

      send information we can consider… ...[b]e careful about admitting 'fault' though."

  ○   "We could be opening up a larger can of worms and indicting ourselves."

**49.**     The meeting that Ms. Hartman convened on June 5, 2019 to address the EMTALA

violations was attended by Stephanie East and other Centra staff members.  The meeting was

conducted at VBH in the executive conference room from 1:00 p.m. to 2:00 p.m.  Michael Judd

did not attend this meeting; however, Stephanie East communicated with him during the meeting

via text messaging.

50.     At this meeting, Ms. Hartman raised the EMTALA violations and their consequences, both in danger to her patients and in liability to Centra.

51.     After the 1:00 p.m. meeting concluded, Stephanie East asked Ms. Hartman to remain for a second meeting between Stephanie East, Michael Judd and Ms. Hartman.  Stephanie East directed Ms. Hartman's student nurse, Megan Franklin, to leave the room.  Stephanie East informed Ms. Hartman that the purpose of the meeting was to discuss Ms. Hartman's future with Centra after Ms. Hartman completed her studies and became a nurse practitioner.

52.     The second meeting began at 2:00 p.m. in the VBH executive conference room.

53.     Megan Franklin left the room, as directed by Stephanie East, and Michael Judd arrived to attend the meeting.

54.     Michael Judd began the 2:00 p.m. meeting by advising Ms. Hartman that her email messages regarding the EMTALA violations "could get circulated" and were "over the top, do you know what I mean?"

55.     Ms. Hartman replied that she did not know what Michael Judd meant and asked him to explain what he meant.

56.     Michael Judd replied that "these things get around and we don't want them to."

57.     Stephanie East said that the email messages Ms. Hartman sent regarding the EMTALA violations were "manic and pressured."

58.     Ms. Hartman stated that she needed to stop the meeting because she would not participate in a cover-up of the EMTALA violations and that she wanted a representative of the human resources department to attend the meeting.

59.     Immediately after the meeting ended abruptly, Ms. Hartman was directed by Stephanie East to leave the hospital without returning to her unit.

60.     Megan Franklin returned to the conference room and Stephanie East told Megan Franklin to go home.

61.     As Ms. Hartman walked to her car from leaving the 2:00 p.m. meeting, she received a text message from Stephanie East that was intended for the human resources department stating, "[c]an I take her keys and badge now?"

62.     After meeting on June 5, 2019, Centra also disabled Ms. Hartman's employee badge, email account, company intranet access, purchasing authority and mobile phone.

63.     In the evening of June 5, 2019, Stephanie East arranged for a meeting with several of Centra's medical executives and with Centra's HR director and General Counsel to discuss Ms. Hartman's EMTALA complaint.

64.     On the evening of June 5, 2019, Centra arranged to have emails from Ms. Hartman's private email account redirected so that Centra employees could not receive her messages.

65.     The 2:00 p.m. meeting was essentially a "shut up, or else" meeting.  The "else" was obviously the termination of Ms. Hartman's employment.

**B.     WHEN SHE WOULD NOT BE SILENCED, CENTRA TERMINATED MS. HARTMAN'S EMPLOYMENT WITHOUT CAUSE**

66.     On June 6, 2019, Ms. Hartman was notified by email by Centra's Human Resources Director, Shannon Meadows, that her employment had been terminated by Centra.  A copy of this email is attached hereto and incorporated herein as **EXHIBIT D**.

67.     Ms. Meadows wrote that "[a]t this point, we believe that it is in everyone's best interest to end our working relationship" and that "if you wish to reduce your demand to something

reasonable, we may reconsider our position."

68.    The only action on Ms. Hartman's part mentioned in the above-referenced email was her

report of Centra's EMTALA violation.

69.    In another email to Ms. Hartman on June 6, 2019, Ms. Meadows reiterated her request for

settlement terms from Ms. Hartman.

70.    In a Centra Human Resources department report created on June 17, 2019, Centra

described the reason for Ms. Hartman's termination of employment: "Ms. Hartman became

escalated during a meeting with Mental Health Leadership on June 5, 2019 where she was

yelling, slamming folders and arguing with Stephanie East and Michael Judd, MD. She was

suspended on June 5 and terminated on June 6, 2019."

71.    In pleadings, Centra has alternatively claimed that Ms. Hartman was "placed on leave."

after the June 5, 2019 meeting.

72.    Since the filing of her lawsuit, Centra has manufactured a series of demonstrably false

"justifications" for firing Ms. Hartman on June 6, 2019, including (i) the false claim that an

investigation into Ms. Hartman's purchasing was in place on June 6th, (ii) that Ms. Hartman had

improperly worked "split-rate" shifts and, (iii) that Ms. Hartman was insubordinate.   None of the

false allegations are documented anywhere in Centra's records.

73.    It is clear that decision to termination Ms. Hartman's employment was made on or before

June 5, 2019.

## C.    CENTRA SENT ARMED GUARDS TO MS. HARTMAN'S HOME TO HARASS HER BY BATTERING ON HER DOOR FOR NEARLY AN HOUR

74.    After she left the meeting at VBH on June 5, 2019, Ms. Hartman suspected that the

termination of her employment was imminent and that her superiors would act to alter or destroy

evidence of the EMTALA violation, so she went home and began to compile and preserve the evidence.

75.    Her suspicion was well-placed, as the next day, on June 6, 2019, and shortly after she was notified that her employment had been terminated, three armed Centra security officers were dispatched to Ms. Hartman's home, where they pounded on the front door of her condominium unit for more than half an hour and screamed that they were there to collect "Centra property."

76.    The Centra security guards acted with the deliberate intent to cause her fear and embarrassment.

77.    The Centra security guards acted under the supervision and the behest of Nathan Campbell.

78.    Eventually, the security guards left Ms. Hartman's residence empty-handed and Ms. Hartman made other arrangements to return Centra's property.

**D.    CENTRA ALTERED RECORDS TO COVER UP ITS EMTALA VIOLATIONS AND PRESENTED THOSE FALSE RECORDS TO INVESTIGATORS**

79.    After the meeting on June 5, 2019, Ms. Hartman reported EMTALA and other violations to the Virginia Department of Health's Office of Licensure and Certification ("OLC").

80.    The OLC is charged with investigating compliance with federal laws and regulations that govern the operation of hospitals that participate in the Medicare or Medicaid programs.

81.    Surveyors from the OLC conducted an investigation of Ms. Hartman's reports and released the findings of the investigation in a "Statement of Deficiencies and Plan of Correction" completed on form CMS-2567 dated July 25, 2019.  A true copy of this document is attached hereto and incorporated herein as **EXHIBIT E**.

82.    The investigation concluded that falsified documents relating to the denial of admission

to the juvenile patients were created and presented to the investigators and that the original

documents were altered on or about the time Ms. Hartman made her complaint:

> "The facility staff's Intake documentation on the Daily Logs,
> specific to the reasons for denial of admission for Patient #21 and
> Patient #22, was altered after the date of it's initial completion, on
> or about the time the concern was brought forward of an EMTALA
> violation related to the denials of Patient #21 and Patient #22."
> **EXHIBIT E**, p.2

83.     The OLC surveyors concluded that a Centra Intake Specialist altered the entries with

regard to these two patients on June 6, 2019, the date on which Ms. Hartman's employment was

terminated.

84.     That employee was Amelia Perry, identified as "Employee 14" in the Statement of

Deficiencies, who had previously denied altering any reports in her statement to the OLC

investigator.

85.     The falsification of the Daily Log entries was discovered only because (i) Ms. Hartman

provided the OLC with the genuine Daily Log and (ii) the OLC investigators used exceptional

means and diligence to track down and account for the fraudulent alterations.


**E.      STEPHANIE EAST LIED TO A SCHOLARSHIP OFFICIAL IN ORDER TO
         PREVENT MS. HARTMAN FROM RECEIVING A SCHOLARSHIP**

86.     Centra and its executives wasted no time in executing their conspiracy to viciously attack

Ms. Hartman in an attempt to discredit her and to punish her for reporting the EMTALA

violations.

87.     On June 6, 2019, when Centra terminated her employment, Ms. Hartman had a

scholarship application pending with the Virginia Health Care Foundation to facilitate her study

at Shenandoah University's Nurse Practitioner program.

88.     On June 10, 2019, Stephanie East, acting on behalf of and at the behest of Centra, sent an

email to Denise Konrad, Director of Strategic Initiatives and Policy at the Virginia Health Care

Foundation with the intent of preventing Ms. Hartman from receiving her scholarship.  Ms. East

wrote:  "…this nurse is no longer with our organization.  Wasn't sure if you needed an update

before distributing scholarship funds."

89.     Neither Centra nor Stephanie East had any legitimate interest in Ms. Hartman's

scholarship application on June 10, 2019.  The email was transmitted to punish Ms. Hartman for

reporting EMTALA violations by attempting to derail her education.

90.     Sometime before June 27, 2019, Stephanie East, acting on behalf of and at the behest of

Centra, telephoned Denise Konrad and falsely informed her that Ms. Hartman's employment had

been terminated by Centra "for cause."

91.     After Stephanie East lied to Denise Konrad about the circumstances of Ms. Hartman's

firing, Ms. Konrad called Ms. Hartman to discuss the false report.  Ms. Konrad notified Ms.

Hartman that her scholarship was in jeopardy as a consequence of the email.  Ms. Hartman

denied being fired for cause and merely responded that she left employment for personal reasons.

92.     Stephanie East made the false report to Ms. Konrad with the deliberate intent of

preventing Ms. Hartman from obtaining her scholarship and furthering her education.

93.     After speaking with Ms. Hartman, Ms. Konrad sent a follow up email to Stephanie East

on June 27, 2019 at 1:23 p.m. informing Ms. East that she had spoken with Ms. Hartman, that

Ms. Hartman had denied being fired for cause and that Ms. East should expect to be contacted by

Ms. Hartman about the false report.

94.     Stephanie East responded two minutes later (at 1:25 p,m.) by email asking Ms. Konrad

"[c]an you tell me exactly what you conveyed to her so we know what to expect?"

95.     A little more than half an hour later, at 2:04 p.m., Stephanie East sent a panicked follow up email to Denise Konrad, writing "Denise, tried to call you.  Please don't send her any email threads.  You and i [sic] talked on the phone."

96.     The above emails evince a clear intent on the part of Centra and Stephanie East to (i) punish Ms. Hartman for reporting EMTALA violations, (ii) defame Ms. Hartman in order to injure her professional reputation and to cause her direct and immediate financial injury, (iii) maliciously prevent, hinder or delay Ms. Hartman's educational and professional development, (iv) attempt to elicit Denise Konrad's assistance in interfering with Ms. Hartman's profession, contracts and future business expectancy.

97.     Stephanie East's malicious and defamatory report to the Virginia Health Care Foundation caused Ms. Hartman to incur substantial legal fees that were necessary to repudiate Ms. East's false report and to facilitate the award of her scholarship.

98.     After the intervention of her attorney,  Ms. Hartman was eventually awarded the scholarship notwithstanding the defamation.

## F.     CENTRA RECOUPED MONEY FROM MS. HARTMAN'S FINAL PAYCHECK TO WHICH IT WAS NOT ENTITLED

99.     Sometime between June 6, 2019, when Shannon Meadows suggested settlement with Ms. Hartman upon "reasonable terms," and June 12, 2019, Centra made the decision to begin a smear campaign against Ms. Hartman instead of attempting to pay her off.

100.     To this end, Shannon Meadows transmitted a letter on June 12, 2019 to Ms. Hartman informing her that her final paycheck would be docked to recoup certain purported expenses and that "at this time, we will not consider a separation agreement or settlement with you".  A copy

of this letter is attached hereto and incorporated herein as **EXHIBIT F**.

101.    Shannon Meadows listed several purported expenses justifying recoupment from Ms.

Hartman:

   ◦ $599.99 claimed as the replacement value of an iPhone 8, which Centra alleged that

    Ms. Hartman intentionally damaged.

   ◦ $250.00 in Amtrak tickets.

   ◦ $123.85 for a "not approved" lunch for Nurse's Week.

   ◦ $50.00 gift card to RA Bistro restaurant.

   ◦ $51.97 in purported malpractice insurance premium payments

   ◦ $207.41 as the purported balance of an outstanding loan

102.    Ms. Meadows concluded her letter to Ms. Hartman with a thinly veiled threat:  "Our

investigation into other unapproved purchases and your behaviors is ongoing…"

103.    None of the above-referenced recoupments is legitimate.  Ms. Hartman's husband

returned the subject iPhone 8, in perfect working order, to Centra, along with a laptop computer.

The remaining claimed expenses were authorized business expenses that Centra wrongfully and

maliciously recouped in order to punish Ms. Hartman for reporting the EMTALA violation.

**G.    CENTRA TERMINATED MEDICAL SERVICES TO MS. HARTMAN'S
   DAUGHTER TO RETALIATE AGAINST MS. HARTMAN**

104.    Centra's malicious retaliation was not limited solely to Ms. Hartman, but was also

directed to her family members, including her autistic daughter, A.H., in order to punish Ms.

Hartman for reporting the EMTALA violations.

105.    A. H. had been a patient of Dr. Jitendra Annapareddy for years.

106.    Dr.  Annapareddy is the only specialist in juvenile autism in Lynchburg.

107.   A. H. was prescribed psychotropic medication by Dr. Annapareddy and A. H. suffers severe and serious side-effects when she does not take the prescribed medication.

108.   In early August, 2019, Ms. Hartman was informed by a local pharmacy that Dr. Annapareddy was refusing to refill A. H.'s prescription.

109.   Ms. Hartman immediately and repeatedly made phone calls and sent emails to get her daughter the prescription she needed, but these requests fell on deaf ears.

## H.   CENTRA ATTEMPTED TO HAVE MS. HARTMAN PROSECUTED ON FALSE CHARGES OF EMBEZZLEMENT

110.   While Ms. Hartman was employed at VBH, Centra provided credit cards to its managers and executives to use for business-related purchases.  These cards were called "P-Cards."

111.   Centra also allowed it managers and executives to purchase personal items with their P-Cards and to reimburse Centra for these purchases.

112.   Ms. Hartman was issued a P-Card and used it frequently and regularly to make purchases for the Child and Adolescent Psychiatric Unit.  A few examples of these purchases include:

- ◦ Coffee and beverages for the unit.
- ◦ Toys and games for the patients.
- ◦ Clothing for the patients
- ◦ Business equipment and electronics.
- ◦ Employee incentives and awards
- ◦ Travel expenses

113.   Ms. Hartman also occasionally made personal purchases with her P-Card and reimbursed Centra for these purchases as required.

114.   On a monthly basis, defendant Stephanie East reviewed Ms. Hartman's P-Card purchases

and approved the business expenses.  Ms. Hartman reimbursed Centra for any personal expenses by check.

115.   This procedure was the standard operating procedure at VBH and all of the managers there used the P-Cards in the way Ms. Hartman did; indeed, most of them used the cards more extensively than she did and, unlike Ms. Hartman, many of these managers abused their authority by making personal expenses and claiming them as business expenses.

116.   After terminating her employment, Centra falsely alleged that Ms. Hartman had abused her purchasing authority to embezzle from Centra.  Centra reported these false claims to law-enforcement officials.

117.   Ms. Hartman was forced to incur further legal expenses to deal with this attempted malicious prosecution.

118.   Ms. Hartman fully cooperated with the law-enforcement investigators and she provided positive proof (in the form of canceled checks) that her purchases had been authorized by Stephanie East and that she had timely reimbursed Centra for any personal items purchased on her P-Card in utter conformity with Centra's policy.

I.   **CENTRA ATTEMPTED TO HAVE MS. HARTMAN'S NURSING LICENSE REVOKED OR SUSPENDED ON THE BASIS OF FALSE ACCUSATIONS**

119.   False criminal charges and retaliation against Ms. Hartman's autistic daughter were insufficient to quell Centra's viciousness in its effort to punish Ms. Hartman for reporting EMTALA violations.  Accordingly, Centra embarked on another vicious campaign to prevent her from working anywhere else by filing false allegations against her with the Nursing Board.

120.   As Ms. Hartman consistently provided the best care for her patients, Centra could not credibly allege any impropriety in Ms. Hartman's care of her patients, so, acting through its

agents, it simply rehashed the above-reference false embezzlement allegations and presented them in a complaint to the Nursing Board.

**121.**    Of course, Centra omitted from its complaint necessary background information and concealed from the Board the facts that (i) Ms. Hartman  participated in monthly reconciliations of her P-Card charges, (ii) Stephanie East approved all purchases and reconciliations and (iii) Ms. Hartman promptly and fully reimbursed Centra for any personal purchases made with her P-Card in complete and utter conformity with Centra policy.

**122.**    Once again, Ms. Hartman was forced incur legal expenses to retain counsel to deal with and refute Centra's false allegations.

**J.    CENTRA BANNED MS. HARTMAN, HER HUSBAND AND EVEN HER LAWYER FROM CENTRA PROPERTY WITHOUT CAUSE AND IN RETALIATION FOR HER REPORT OF EMTALA VIOLATIONS**

**123.**    Centra operates the only hospital emergency room in Lynchburg.  The ER is located at Lynchburg General Hospital.

**124.**    On November 16, 2019, Ms. Hartman's mother-in-law suffered a medical emergency.

**125.**    Ms. Hartman, along with her husband and her daughter, A.H., transported Ms. Hartman's mother-in-law to the ER at Lynchburg General Hospital.

**126.**    Ms. Hartman visited her mother-in-law in a treatment area, where she was accosted and verbally abused by Wesley Gillespie, acting on behalf of and at the behest of Centra and within the scope of his employment.  Mr. Gillespie's abuse of Ms. Hartman was so extreme that at least one other patient complained about his conduct.

**127.**    In the face of this abuse, Ms. Hartman left the treatment area and returned to the ER lobby where she telephoned her attorney, who quickly responded to the ER waiting room, where

he met her and her family.

128.    Ms. Hartman, her attorney and her family were waiting quietly and peacefully in the ER

lobby when Mr. Gillespie approached them and, without cause, began aggressively insulting and

threatening them.

129.    Mr. Gillespie ceased his abusive and threatening behavior only upon recognizing that Ms.

Hartman's attorney was present, when he ceased his abusive conduct and retreated to the security

desk.

130.    Mr. Gillespie summoned a Lynchburg Police Department officer and attempted to

persuade that police officer to harass and intimidate Ms. Hartman and her family.  The police

officer communicated briefly with Ms. Hartman and her husband, but refused to intercede as Mr.

Gillespie asked him to do.

131.    Nathan Campbell, acting within the scope of his employment by Centra Health, Inc.,

maliciously published the false allegations against Ms. Hartman by transmitting a copy of his

letter to her to the Lynchburg Police Department.

132.    Nathan Campbell falsely accused Ms. Hartman of "demonstrated aggressive and

threatening behavior towards various staff members which has impeded patient care."

133.    Ms. Hartman never engaged in aggressive or threatening behavior to anyone at any time

at any Centra facility.

134.    Centra, acting by and through its agents, caused the above-referenced letters to be

transmitted to the recipients in order to continue its malicious and vicious punishment of Ms.

Hartman for reporting EMTALA violations.

135.    In transmitting the letter to the Lynchburg Police Department, Nathan Campbell

attempted to enlist the Lynchburg Police Department into a conspiracy to injure Ms. Hartman's

professional reputation and to punish her for reporting EMTALA violations.

## DAMAGES

**136.**    Ms. Hartman suffered serious, permanent and continuing damages as a result of the

above-described actions, including, without limitation, loss of income, loss of benefits, loss of

experience, damage to her professional reputation, extreme mental anguish, embarrassment, loss

of future business income and travel expenses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**CENTRA'S RETALIATION AGAINST PLAINTIFF KIMBERLY HARTMAN FOR
REPORTING EMTALA VIOLATIONS AT VIRGINIA BAPTIST HOSPITAL**

**137.**    Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

**138.**    The Emergency Medical Treatment and Labor Act ("EMTALA") prohibits hospitals that

participate in the Medicare or Medicaid programs from refusing to accept transfers of patients

from other hospitals when those patients need specialized care for stabilization:

> Nondiscrimination.—A participating hospital that has specialized
> capabilities or facilities (such as burn units, shock-trauma units,
> neonatal intensive care units, or (with respect to rural areas)
> regional referral centers as identified by the Secretary in
> regulation) shall not refuse to accept an appropriate transfer of an
> individual who requires such specialized capabilities or facilities if
> the hospital has the capacity to treat the individual.   U.S.C. §
> 1395dd(i)

**139.**    "A participating hospital may not penalize or take adverse action against… ...any

hospital employee because the employee reports a violation of a requirement of this section."  42

U.S.C. § 1395dd(i)

140.    Virginia Baptist Hospital is a "participating hospital" as contemplated by EMTALA.

141.    Centra, acting by and through its employees, cannot legally refuse to accept emergent

transfer of any patient to any of its psychiatric units if it has the capability and capacity to treat

the patient.  Such refusal violates the EMTALA.

142.    Ms. Hartman discovered the EMTALA violations resulting from the denial of admission

to the two emergent juvenile psychiatric patients to her unit and she took immediate steps to

report and correct the violations, to protect and care for these children and also took steps to

prevent future violations.

143.    The facts stated above demonstrate not just a malicious intent to silence and discredit Mr.

Hartman by penalizing her with adverse action, but also clearly evince a visceral and vicious

attempt by Centra, acting by and through its executives, to utterly destroy her and to harm her

family in retribution for her report of the EMTALA violations at Centra.

144.    Upon investigation of the low patient census, Ms. Hartman discovered that patients were

unlawfully being denied admission for emergency treatment in her unit in violation of the

EMTALA.

145.    Specifically, two young psychiatric patients who had been diagnosed with psychiatric

emergencies in the emergency rooms at other hospitals in Virginia were denied transfer to the

child/adolescent psychiatric unit at VBH for emergency care simply because they were autistic

and lived outside of the area.

146.    Autism was not a valid exclusion criterion that would justify denial of admission to the

Child and Adolescent Psychiatric Unit at VBH.  Neither was the fact that a child happened to live

outside of the Lynchburg area.

147.    Upon further investigation, and after inspecting the patient intake sheets, Ms. Hartman discovered that Centra had been routinely refusing to accept transfers of patients with psychiatric emergencies when those patients met admission criteria.

148.    Centra maintains "careful consideration lists" that it uses to deny admission to patients in its psychiatric units.

149.    The careful consideration lists are kept secret and are not publicly disclosed.

150.    The careful consideration lists are effectively blacklists that are used to deny admission to patients on the basis of invalid exclusion criteria, such as: filing complaints against Centra or its employees, alleging human rights violations or filing human rights complaints, threatening litigation and merely having a diagnosis of autism.

151.    Ms. Hartman discovered that the careful consideration lists were being used to violate the EMTALA by refusing emergency treatment.

152.    Ms. Hartman notified Stephanie East and Michael Judd of the EMTALA violations by email.

153.    Ms. Hartman is entitled to recovery of damages, including compensatory and punitive damages, along with the reasonable attorney's fees, costs and expenses incurred in bringing this action.

## SECOND CAUSE OF ACTION

### DEFAMATION BY DEFENDANTS CENTRA HEALTH, INC. AND STEPHANIE EAST

154.    Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

155.    Ms. Hartman is, and has at all times been, a private individual.  She has never been a public figure or official.

156.　　Stephanie East's false report to the Virginia Health Care Foundation that Ms. Hartman had been fired "for cause" was malicious and defamatory *per se* because it prejudiced Ms. Hartman in her profession.

157.　　Stephanie East knew that Ms. Hartman's employment was terminated unlawfully and without cause because Mr. Hartman reported EMTALA violations.  The statement that Ms. Hartman had been fired "for cause" was not an expression of opinion, but a deliberate lie.

158.　　Stephanie East's attempts to prevent Ms. Hartman from seeing the emails is clear and convincing evidence of malice.

159.　　Stephanie East also defamed Ms. Hartman by falsely reporting to Centra employees after Ms. Hartman's employment had been terminated that Ms. Hartman was "mentally ill" and that Ms. Hartman "posed a risk of gun violence" to these employees.

160.　　Stephanie East acted in the scope of her employment by Centra Health, Inc. when she made the above-referenced defamatory statements.

161.　　Stephanie East acted with actual malice and with the intent of prejudicing Ms. Hartman in her profession when Ms. East defamed Ms. Hartman.

### THIRD CAUSE OF ACTION

### UNLAWFUL WITHHOLDING OF WAGES OR SALARY IN VIOLATION OF CODE OF VIRGINIA § 40.1-29 BY DEFENDANT CENTRA HEALTH, INC.

162.　　Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

163.　　After Centra terminated Ms. Hartman's employment, Centra knowingly withheld, and continues to withhold, $1,283.22 from Ms. Hartman's salary or wages.

164.　　The $1,283.22 that was withheld from Ms. Hartman's salary or wages was not withheld as payroll, income or withholding taxes.

**165.**     No law authorized Centra to withhold $1,283.22 from Ms. Hartman's salary or wages.

**166.**     Centra continues to withhold $1,283.22 from Ms. Hartman's salary or wages.

**167.**     Ms. Hartman did not execute any written and signed authorization that permitted Centra to withhold $1,283.22 from her salary or wages.

**168.**     Pursuant to Code of Virginia § 40.1-29 (G),  Ms. Hartman is entitled to recover the entire amount ($1,283.22) of the salary or wages Centra unlawfully withheld, plus 8% interest from June 12, 2019, the date of unlawful withholding.

**169.**     Pursuant to Code of Virginia § 40.1-29 (J), in addition to recovery of her unlawfully withheld salary or wages and the recovery of interest as described above, Ms. Hartman is also entitled to recover (i) three times the amount of her withheld wages ($3,849.66) in liquidated damages, plus 8% interest from June 12, 2019, the date of unlawful withholding, and (ii) the reasonable attorney's fees and costs incurred in bringing this action.

**FOURTH CAUSE OF ACTION**

**WRONGFUL TERMINATION OF EMPLOYMENT BY DEFENDANT CENTRA HEALTH, INC. IN VIOLATION OF PUBLIC POLICY**

**170.**     Ms. Hartman incorporates and re-alleges all of the foregoing allegations herein.

**171.**     The EMTALA's statutory protection of whistleblowers is a plainly stated public policy intended to protect all citizens of the United States against patient-dumping by hospitals that participate in federal health care programs.

**172.**     The provisions of the EMTALA's whistleblower protections are unambiguous – a hospital may not punish any employee for reporting an EMTALA violation.

**173.**     EMTALA violations violate state law.  Code of Virginia § 32.1-125.4 provides that:

> No hospital may retaliate or discriminate in any manner against

> any person who (i) in good faith complains or provides information to, or otherwise cooperates with, the Department or any other agency of government or any person or entity operating under contract with an agency of government having responsibility for protecting the rights of patients of hospitals, or (ii) attempts to assert any right protected by state or federal law.

**174.**   Ms. Hartman was punished for reporting EMTALA violations with, among other and continuing adverse actions, the wrongful and unlawful termination of her employment by Centra.

**175.**   Ms. Hartman is a member of the statute's class of protected persons and so fell within the protective reach of Code of Virginia § 32.1-125.4 when she was unlawfully discharged from employment.

**176.**   Ms. Hartman is a member of the statute's class of protected persons and so fell within the protective reach of EMTALA's whistleblower protection when she was unlawfully discharged from employment.

**177.**   Ms. Hartman suffered, and continues to suffer, extensive damages as a result of the wrongful and unlawful termination of her employment by Centra Health, Inc., including loss of income, loss of benefits, loss of experience, loss of seniority, damage to her professional reputation, extreme emotional distress and legal expenses.

**WHEREFORE** your Plaintiff, Kimberly Hartman, requests that this Court grant her the following relief:

(a)   Judgment against defendants Centra Health, Inc. and Stephanie East, jointly and severally, in the amount of NINE MILLION DOLLARS ($9,000,000.00) and such additional damages as may be proven at trial.

(b)   Punitive damages in amount proven upon trial;

(c)   Costs and expenses, including reasonable attorney's fees;

(d)    Injunctive relief to prevent further unlawful conduct;

(e)    All such other legal and equitable relief as this Court deems appropriate.

## A JURY TRIAL IS DEMANDED

Respectfully submitted,

**KIMBERLY HARTMAN**
**By Counsel**

**JAMES RIVER LEGAL ASSOCIATES**
**7601 Timberlake Road**
**Lynchburg, Virginia 24502**
**P (434) 845-4529**
**F (434) 845-8536**
**mvalois@vbclegal.com**

**By:**

_/s/ M. Paul Valois_
**M. Paul Valois, Esquire**
**Counsel for Plaintiff**
**Virginia State Bar No. 72326**